Docket No. 99607–Agenda 22–May 2005.

EDWIN N. GUNN, Indiv. and as Trustee of the Edwin N. Gunn Trust under Trust Agreement dated 3/25/93 as amended lastly in 1998, 2000 and 2001, Dr. Donald J. Hull, Successor Trustee, Appellant, v. LEORRAINE “LEE” SOBUCKI, Appellee.

Opinion filed October 6, 2005.

JUSTICE KARMEIER delivered the opinion of the court:

Plaintiff, Edwin Gunn, brought an action in the circuit court of McHenry County against Leorraine “Lee” Sobucki contesting her ownership of a coin collection. Gunn’s complaint was in two counts. Count I asserted a cause of action for replevin. Count II sought damages based on conversion. Following a bench trial, the circuit court entered judgment in favor of Gunn as to count I, declaring him to be the lawful owner of the coin collection, issuing a writ of replevin for recovery of the coins from Sobucki and awarding him his costs of suit. In a separate order, the circuit court denied Gunn’s motion for entry of judgment as to count II. Sobucki appealed. Gunn cross-appealed. The appellate court reversed and remanded for a new trial. 352 Ill. App. 3d 785. We granted Gunn’s petition for leave to appeal. 177 Ill. 2d R. 315. For the reasons that follow, we now affirm the judgment of the appellate court.

The coin collection at issue in this case weighs one-half ton and was housed in approximately three dozen lock boxes and a suitcase. It was once owned by Gunn, who was a longtime friend of Robert Sobucki, Lee Sobucki’s husband. In 1979, while experiencing marital difficulties, Gunn moved out of his Glenview home and into the Sobuckis’ residence in Medinah, bringing the coin collection with him. On October 5, 1979, Gunn executed a notarized bill of sale stating that he had conveyed the collection to Mr. Sobucki for the sum of $30,000. The collection remained at the Sobuckis’ home continuously from 1979 until the circuit entered its judgment in this case. Gunn owned two additional boxes of coins, referred to as “family coins,” which he also brought to the Sobuckis’ home. Those coins were not covered by the bill of sale, were returned to Gunn when he asked for them several years later, and are not involved in this litigation.

Gunn subsequently moved from Illinois to the state of Florida, where he obtained a divorce from his wife, Gwendolyn, in 1981. The judgment of dissolution entered by the Florida court distributed the parties’ real and personal property between them. Under that distribution, Gunn was awarded “the coin collection testified to by the parties” as well as “any proceeds [he] may have received as a result of a sale of any of the coins.” At the same time, the court made a lump sum award to Gwendolyn, which it characterized as being in the nature “of an equitable distribution of the various properties testified to by the parties,” in the amount of $30,000.

Robert Sobucki died in 1998 and Mrs. Sobucki, his widow, inherited all of his personal property. Approximately two years after Robert’s death, Gunn demanded that Mrs. Sobucki give the coins back to him. When she refused, Gunn initiated this litigation seeking replevin or, in the alternative, damages based on conversion.

Mrs. Sobucki raised numerous defenses to Gunn’s cause of action, including that his claims were barred by the applicable statutes of limitation. Her principal argument, however, was that because Gunn had sold the coin collection to her husband, Robert, as evinced by the notarized bill of sale, Gunn no longer had a legally cognizable claim to possession or ownership of the collection.

Gunn did not dispute that he delivered the coin collection to the Sobucki home in 1979, executed the notarized document attesting that he had sold the collection to Mr. Sobucki for $30,000, and left the collection with the Sobuckis until after Mr. Sobucki’s death. He argued, however, that the bill of sale was nothing more than a sham document intended to conceal his ownership so that his ex-wife could not lay any claim to the collection during their divorce proceedings 20 years earlier. According to Gunn, Robert Sobucki was only to have watched over the coins while Gunn was in Florida and never actually paid the consideration stated in the bill of sale.

Gunn, who was a lawyer and member of this state’s bar, claimed that he never used the sham bill of sale in the Florida divorce proceedings and instructed Mr. Sobucki to destroy his copy of the document a year or so after the divorce became final. If he gave Sobucki such instructions, however, they were not followed. Mr. Sobucki retained his copy of the bill of sale, as did Gunn.

Gunn buttressed his contention that no sale had actually occurred in a variety of ways. He presented the testimony of two friends, the Dimphls, who related a conversation they had witnessed between Gunn and the Sobuckis, during which Gunn allegedly referred to the coins, still in the Sobuckis possession, as “his coins” and cautioned the couple against touching his coins with bare hands. He noted that Mrs. Sobucki was unable to produce records of the $30,000 allegedly paid by her husband to Gunn for the coins and observed that the coin collection was not mentioned in the wills executed by either Mrs. Sobucki or her husband, though it would have been the second-largest asset in her husband’s estate. In addition, he pointed to Mrs. Sobucki’s testimony that before 1979, her husband showed no interest in coin collecting and, after acquiring the collection, added no new coins to it, did not display it, and never had it appraised.

In response to the question of why, if there had been no sale, he had waited two decades, until after Mr. Sobucki’s death, before attempting to retrieve the coin collection, Gunn advanced various explanations. He testified that he was worried about the humidity of Florida’s climate, which allegedly could damage the coins. He feared that a hurricane might rip through the area, destroying the collection. He also cited the “exorbitant” cost of storing the collection in a climate-controlled place, such as a bank vault or a specially constructed vault.

A lengthy document written by Gunn around the time of the transaction which detailed his affairs and which was admitted into the record for purposes of impeachment contained an entry labeled “coins” with the notation:

“Bought Oct. 1979  $30,000.00

Paid in cash in March-April, 1980 in Chicago

Gunn: needed cash

Cost price paid”

The foregoing evidence was presented to the circuit court, sitting without a jury. After hearing the testimony, reviewing the exhibits admitted into evidence and listening to the arguments of counsel, the circuit court ruled that Gunn was entitled to possession of the coins. The court found the bill of sale to be without effect because of a total failure of consideration and concluded that when Gunn transferred possession of the collection to the Sobuckis, he never intended to surrender his ownership rights to them. Accordingly, the court entered judgment for Gunn on his replevin claim and held that he was entitled to recovery of the coin collection from Mrs. Sobucki. As noted earlier in this opinion, the court subsequently denied Gunn’s motion for entry of judgment on his alternative claim for conversion.

 Mrs. Sobucki appealed, arguing, among other things, that the admission of portions of Gunn’s testimony violated the Dead-Man’s Act (735 ILCS 5/8–201 (West 2002)). Gunn cross-appealed, seeking judgment for approximately $5,000 to compensate him for coins allegedly missing from the collection. The appellate court found Mrs. Sobucki’s Dead-Man’s Act challenge to be meritorious and concluded that admission of Gunn’s testimony in violation of the Act was an error requiring reversal of the trial court’s judgment and remand for a new trial. Because a new trial was necessary, the court did not address Gunn’s cross-appeal. 352 Ill. App. 3d 785. Gunn then petitioned our court for leave to appeal, which we allowed. 177 Ill. 2d R. 315.

As grounds for challenging the appellate court’s judgment, Gunn first contends that the court erred when it declined to follow 
Smith v. Haran
, 273 Ill. App. 3d 866 (1995), in assessing whether the Dead-Man’s Act barred Gunn’s testimony. 
Smith
 held, among other things, that the Act did not bar defendants from testifying that a decedent had never paid them the consideration specified in a promissory note they had executed. Based on that holding, Gunn argues that the Act should likewise not bar his testimony about Mr. Sobucki’s alleged failure to pay the consideration specified in the bill of sale here. We review evidentiary rulings for abuse of discretion (
In re Estate of Hoover
, 155 Ill. 2d 402, 420 (1993)), but the construction of a statute presents a question of law, which we review 
de novo. 
See
 Quad Cities Open, Inc. v. City of Silvis
, 208 Ill. 2d 498, 515 (2004).

The Dead-Man’s Act provides:

“In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took place in the presence of the deceased ***.” 735 ILCS 5/8–201 (West 2002).

As used in the Act, “[r]epresentative” is defined as “any executor, administrator, heir or legatee of a deceased person.” 735 ILCS 5/8–201 (West 2002).

The Act bars only that evidence which the decedent could have refuted. 
Smith
, 273 Ill. App. 3d at 875. The purposes of the Act are to protect decedents’ estates from fraudulent claims and to equalize the position of the parties in regard to the giving of testimony. 
Hoem v. Zia
, 159 Ill. 2d 193, 201 (1994).

Smith v. Haran
, 273 Ill. App. 3d 866 (1995), the case upon which Gunn relies in urging reversal of the appellate court’s judgment, involved an action by the administrator of a decedent’s estate to enforce a promissory note executed by defendants under which defendants agreed to repay the decedent $125,000 within 12 months at 10% interest. Among defendants’ various defenses to the administrator’s claim was that the note was unenforceable because the decedent had given no consideration in exchange for their promise to pay. At trial, the circuit court barred the defendants from testifying as to their dealings with the decedent based on the Dead-Man’s Act. The appellate court reversed and remanded for a new trial. Rejecting the circuit court’s interpretation of the statute, the appellate court reasoned that the decedent’s alleged failure to provide consideration would not qualify as an “event” within the meaning of the Act. Defendants’ “negative” testimony, 
i.e.
, their testimony that the decedent never paid them anything, should therefore have been allowed. 
Smith
, 273 Ill. App. 3d at 876-78.

One justice wrote separately, concurring in part and dissenting in part. He agreed that the cause should be reversed and remanded, but rejected the majority’s conclusion that allowing defendants to testify regarding the decedent’s failure to provide consideration would not violate the Dead-Man’s Act. In the dissenting justice’s view, there was nothing in the Act that would justify a distinction to be drawn based on whether the decedent had or had not taken action. “[T]he law is irrefutable,” he wrote. “[T]estimony that one did not do a certain act is equivalent, for purposes of the Act, to testimony that he or she did the act and is prohibited.” 
Smith
, 273 Ill. App. 3d at 880 (Hartman, J., concurring in part and dissenting in part). Accordingly, he concluded, “[t]o sanction the [defendants’] direct testimony that no money was ever exchanged *** clearly and impermissibly defeats the purposes of the [Dead-Man’s] Act and judicially repeals its provisions.” 
Smith
, 273 Ill. App. 3d at 881 (Hartman, J., concurring in part and dissenting in part).

The appellate court in the case before us shared this view. It believed that the distinction drawn by the 
Smith 
majority between positive testimony that an event had occurred and negative testimony that it had not occurred was “nothing more than a semantic exercise” and should be rejected. 352 Ill. App. 3d at 788. We agree. For purposes of applying the Dead-Man’s Act, there is no logical basis for distinguishing between a payment made and one not made. In either case, the transaction, if it took place, would have occurred in the decedent’s presence, and the decedent could have refuted the claim were he present at trial. In either case, the “event” at issue is simply payment. Whether the payment was made is, as noted by the appellate court, merely a “detail” of the event.

The Act’s dual purposes–equalizing the footing among parties and preventing fraudulent claims against estates–are best served by adopting the construction of the law followed by the appellate court in this case. Since a decedent is unable to testify about a payment, whether actually made or not, fairness dictates that an adverse party also be unable to testify as to the payment. While the rule may appear to disadvantage a living claimant, a claimant is free to pursue other evidence, not barred by the Act, which would support his claims. We note, moreover, that taking a contrary view and allowing one-sided testimony regarding payments allegedly not made would have the undesirable effect of encouraging the filing of fraudulent claims against estates, because a critical party, the decedent, would be unable to dispute such claims.

The interpretation we follow here is not new. More than a century ago, in 
Lockwood v. Onion
, 56 Ill. 506, 508 (1870), this court held that testimony that one had not received an amount of money as consideration from a decedent was prohibited by the Dead-Man’s Act. 
As in this case, the plaintiff in 
Lockwood
 claimed the decedent failed to fulfill the promised consideration and the plaintiff introduced evidence to support the claim. Our court, clearly, and without need for explanation, held that evidence of nonpayment to have been improperly admitted.

The Dead-Man’s Act, as it existed then, is similar to today’s Act, except that the current version is slightly less restrictive. Compare 1867 Ill. Laws 183, ྷ2, with 735 ILCS 5/8–201 (West 2002).
(footnote: 1) The purpose of the former Act, to place living and dead parties “upon a perfect equality” (
Alexander v. Hoffman
, 70 Ill. 114, 118 (1873)), and to avoid the possibility of fraudulent claims against decedents’ estates (
Fredrich v. Wolf
, 383 Ill. 638, 642-43 (1943), mirror the goals of the present Act (see 
Hoem
, 159 Ill. 2d at 201). Furthermore, “[t]he provisions of [the Code of Civil Procedure] insofar as they are the same or substantially the same as those of any prior statute, shall be construed as a continuation of such prior statute ***.” 735 ILCS 5/1–102 (West 2002). Because the current and former versions of the Dead-Man’s Act are, textually and in purpose, substantially the same, this court’s interpretation of the Act to bar “unmade payment” testimony remains correct. To the extent that 
Smith v. Haran
, 273 Ill. App. 3d 866 (1995), holds otherwise, it is overruled.

Gunn argues, in the alternative, that the appellate court’s judgment should nevertheless be reversed because even if one disregards the testimony which should have been barred under the Dead-Man’s Act, there was ample evidence to support the circuit court’s decision. This argument is without merit. It is true that not every defect in trial court proceedings requires reversal of the judgment. Where a case is tried by the court without a jury, as this one was, error in the admission of evidence is not grounds for reversal so long as there is sufficient competent evidence fairly tending to support the trial court’s judgment. See 
The Habitat Co. v. McClure
, 301 Ill. App. 3d 425, 440-41 (1998). A new trial should be ordered only when the evidence improperly admitted appears to have affected the outcome of the trial. See 
Tzystuck v. Chicago Transit Authority
, 124 Ill. 2d 226, 243 (1988). This, however, is such a case.

As we have indicated, the claim on which Gunn prevailed at trial was for replevin. Replevin is strictly a statutory proceeding. See 
Harrisburg Community Unit School District No. 3 v. Steapleton
, 195 Ill. App. 3d 1020, 1023 (1990); 735 ILCS 5/19–101 
et seq.
 (2002). To prevail, a plaintiff must recover on the strength of his or her own title or right to immediate possession. One who has no right to possession of the property cannot maintain replevin even against a person who has no title to the property and is wrongfully in possession of it. See 
Hanaman v. Davis
, 20 Ill. App. 2d 111, 115-16 (1959).

In this case, there is no dispute that Gunn owned the coin collection until 1979. It is equally undisputed, however, that in October of 1979, Gunn executed a notarized bill of sale which recited that he had transferred, sold and assigned the coin collection to Mrs. Sobucki’s husband; that Gunn had in fact surrendered possession of the coin collection to Sobucki’s husband; that shortly after the bill of sale was executed, Gunn drafted a document for his own use indicating that he had sold the coins for $30,000 because he needed cash; that the coins remained in the Sobuckis’ sole possession and control for the next 20 years; and that Gunn made no claim that the coins should be returned to him until after Mrs. Sobucki’s husband had died and could no longer refute Gunn’s assertions that no
 bona fide 
sale of the collection had ever occurred.

When the Dead-Man’s Act is properly applied in this case and one eliminates Gunn’s testimony regarding events which allegedly took place in Mr. Sobucki’s presence (see 735 ILCS 5/8–201 (West 2002)), the only things Gunn has left to challenge the foregoing evidence are (1) the Dimphls’ testimony that once, some 16 years after the sale, Gunn referred to the coins, still in the Sobuckis’ possession, as “his coins” and cautioned the couple against touching the coins with their bare hands; (2) Mrs. Sobucki’s inability to produce records to substantiate the $30,000 payment her husband made to Gunn for the coins; (3) the observation that the coin collection was not mentioned in Mr. Sobucki’s will, though it would have been the second-largest asset in his estate; (4) Mrs. Sobucki’s testimony that before 1979, her husband showed no interest in coin collecting, and that after acquiring the collection, he added no new coins to it, did not display it, and never had it appraised; (5) evasiveness by Mrs. Sobucki when Gunn and investigators he hired tried to ascertain the whereabouts of the collection after Mr. Sobucki’s death; and (6) Gunn’s explanation that his long delay in attempting to recover the collection was attributable to concerns over climate, safety and cost.

None of these factors, individually, or in aggregate, are sufficient to overcome the documentary and testimonial proof presented at trial that Mrs. Sobucki’s husband had, in fact, purchased the coin collection from Gunn in 1979. Indeed, none of these factors is necessarily even inconsistent with the evidence showing that a valid sale had occurred. This was a cash transaction. There was no cancelled check that could have served as confirmation of payment. While old bank statements might have allowed the source of the cash to be traced through Mr. Sobucki’s accounts, the event transpired over two decades ago, and there would have been no reason to expect the Sobuckis to preserve bank records for such a long period of time.

 Had Gunn acted more seasonably in laying claim to the coins, the problems in documenting the payment might have been avoided. His suggestion that the delay was attributable to climatic and other considerations is belied by the fact that he had no reservations about keeping other boxes of coins, one of which included a gold coin that was by itself worth $50,000, with him in Florida during the relevant period. It is further belied by the fact that he chose to take the entire collection with him back to Florida as soon as the circuit court entered judgment for him in this case.

That Gunn may have referred to the coins as his when he encountered the Sobuckis in public after the sale is of little consequence. It is not uncommon for a seller, upon seeing the buyer with the goods at some future time, to inquire about the goods in a manner, which to an outsider, would seem to reflect that the goods still belong to the seller. For example, a seller might ask a buyer of a car, “How’s my car driving for you?” or caution the buyer to “take care of my car.”

Although it is true that Mr. Sobucki may have shown no interest in coin collecting before or after this sale, one must keep in mind the context in which this transaction arose. Gunn was Mr. Sobucki’s old friend. Gunn was facing marital strife and needed cash. The evidence showed that Sobucki had cash and could afford a purchase of this kind. The reasonable inference is that the reason Mr. Sobucki bought the collection was simply to help Gunn out, not because he had any interest in numismatics.

Gunn can draw no support for his claim from Mr. Sobucki’s failure to mention the coin collection in his will. Mr. Sobucki’s will did not describe any of his personal property by name and there was no need for such description, considering that he left everything to his wife. We note, moreover, that there was nothing remarkable about Mrs. Sobucki’s evasiveness when Gunn and investigators he hired attempted to ascertain the status of the coin collection. Mrs. Sobucki knew about the bill of sale and considered the coin collection to be her husband’s. She testified to being shocked when Gunn, whom she disliked and distrusted, attempted to claim that the coins were still his and explained that the investigators Gunn sent to her home frightened her. Mrs. Sobucki was so frightened and upset, in fact, that she actually reported Gunn’s actions to the local police. Such emotions are entirely understandable, especially considering that Mrs. Sobucki was elderly, had recently lost her husband and was living alone.

Given these considerations, it is clear that the circuit court could not have reached the result it did had it not also considered Gunn’s testimony that his sworn bill of sale was, in fact, a sham and that Mr. Sobucki had never actually paid him $30,000 in cash to buy the coin collection. Gunn’s testimony was integral to the circuit court’s judgment. Because admission of that testimony violated the Dead-Man’s Act and because its improper admission affected the outcome of the trial, the appellate court was correct in reversing the circuit court’s judgment and remanding the cause for a new trial.

On retrial, Gunn will not be able to prevail unless he can marshal additional evidence, not barred by the Dead-Man’s Act, to prove that no consideration was paid for the coins and that the bill of sale he signed under oath has no effect. That is so because without such a showing, Gunn has no grounds to assert title or right to immediate possession of the coin collection or claim that the collection was converted by Sobucki. Gunn’s sham document theory is therefore likely to come before the circuit court again. For that reason, there are a number of issues concerning that theory we must address.

First, the circuit court seems to have taken the view that Gunn’s original plan was to conceal the actual existence of the coins and that because the Florida dissolution decree mentions a coin collection and the proceeds from the sale thereof, Gunn must have abandoned his plan. We note, however, that Gunn had at least two separate sets of coins, those that were the subject of the 1979 bill of sale and those that were contained in the boxes that the Sobuckis delivered to Gunn after he had moved to Florida. Gunn was obviously an avid coin collector, and it is entirely possible that he had additional coin sets acquired later. It could be that the Florida court was fully aware of all of these coins when it entered its final judgment, but the record of the Florida proceedings was not made part of this record, so there is no way to know. Unless Gunn adduces additional proof, the circuit court’s conclusion that the Florida court was fully aware of the coin collection at issue in this case cannot be sustained by the evidence. Correspondingly, the contents of the Florida court’s judgment, standing alone, cannot be invoked to establish that Gunn had abandoned his scheme and did not actually deceive his wife or the Florida judge.

A more fundamental flaw in the circuit court’s analysis is that it misapprehends the nature of the scheme Gunn alleges he intended to carry out. If Gunn’s claims about the sham bill of sale are true, it is clear that he was not trying to conceal the existence of the coin collection itself. If that were his aim, he would not have created a paper trail by executing a notarized bill of sale and producing multiple copies of it, nor would he have discussed the collection in a public place and in the presence of people both he and the Sobuckis knew. He would simply have given the boxes and suitcase to Mr. Sobucki to hide in his house.

 A far more plausible explanation for the sham, if a sham there was, is that Gunn was simply attempting to prevent his wife from sharing in the coin collection’s full value when their property was divided in the dissolution proceedings. Testimony presented by Gunn at trial established that Gunn had spent at least $40,000 in acquiring the collection, that its worth at the time the bill of sale was executed in 1979 was between $80,000 and $85,000, and that by the time of trial, its market value was in excess of $100,000. Claiming that the coins had been sold for $30,000 and preparing a bill of sale to substantiate that claim, would have enabled Gunn to shield the collection from further appraisal and provided him with documentation indicating worth far less than its true market value. The lower the value, of course, the less he stood to pay in the divorce.

Whatever the precise nature of Gunn’s alleged scheme and regardless of whether the Florida court was actually deceived by it, one thing is clear: if there was a scheme, its purpose was improper. Gunn was an experienced lawyer fully aware of the legal ramifications of executing a document under oath. If Gunn’s claims are true, it means that despite that knowledge, and in disregard of his obligations as an attorney and counselor at law, Gunn made the deliberate decision to swear falsely simply because he thought it might help him secure some monetary advantage against his wife in their dissolution proceedings. Having taken that action, Gunn would now have the courts of this state ignore his sworn signature, free him from the consequences of his wrongdoing, and intercede to restore him to the position he was in before the bill of sale was executed more than a quarter century ago.

Although replevin is an action at law (
General Motors Acceptance Corp. v. Vaughn
 358 Ill. 541, 547 (1934), equitable principles have been held to apply to replevin proceedings (see 
Adams v. Greg Weeks, Inc.
, 327 Ill. App. 3d 380, 384 (2002). Few principles of equity are more basic than the doctrine that one seeking the aid of the courts is prohibited from taking advantage of his own wrongdoing. See 
American National Bank & Trust Co. of Chicago v. Vinson
, 273 Ill. App. 3d 541, 544 (1995). Courts will not help those who seek to found their cause of action upon an illegal or immoral act or transaction. See 
Mettes v. Quinn
, 89 Ill. App. 3d 77, 80 (1980). Accordingly, the law will not permit a party to deliberately place his property out of his control for a fraudulent purpose and then, through the intervention of a court of equity, regain title after his fraudulent purpose has been accomplished. Rather, the court will leave the parties as it finds them. 
Hanley v. Hanley
, 14 Ill. 2d 566, 574 (1958).

The circuit court in this case appeared to believe that Gunn’s actions could be excused because no one was actually deceived by his misconduct. For reasons just discussed, whether actual deception occurred cannot be determined based on the record thus far presented. Even if there was no actual deception, however, that is not sufficient justification to excuse what Gunn did. In ascertaining whether a party should be barred from recovery based on his own wrongdoing, courts will look to a party’s intent, not the effect of his actions. See 
Regnery v. Meyers
, 345 Ill. App. 3d 678, 685 (2003).

In making these observations, we hasten to add that it is not our intention to prejudge the case. Our purpose is simply to provide guidance to the circuit court on remand. Application of the pertinent equitable considerations is a matter for the trial court’s discretion. See 
American National Bank & Trust Co. of Chicago v. Vinson
, 273 Ill. App. 3d at 544. We shall therefore leave them to the trial court to consider in the first instance.

One final matter warrants comment. The trial court’s judgment characterized Gunn’s conduct as exhibiting questionable judgment. In our view, it was significantly more serious than that. No further proceedings in the circuit court are necessary to persuade us that Gunn’s conduct may have violated the Illinois Rules of Professional Conduct. The clerk of our court is therefore directed to forward a copy of this opinion to the Attorney Registration and Disciplinary Commission to determine whether disciplinary action should be taken against him.

For the foregoing reasons, the judgment of the appellate court is affirmed.

Affirmed.
 

CHIEF JUSTICE THOMAS, specially concurring:

I agree with Justice Karmeier’s conclusion that Gunn’s testimony was barred by the Dead Man’s Act and that the error in admitting this testimony necessitates a new trial. After determining that a new trial is warranted, however, Justice Karmeier determines how the evidence should be weighed at the second trial. I do not join this part of the lead opinion.

Justice Karmeier notes that the standard for determining whether a new trial should be ordered because of improperly admitted evidence is whether that evidence “appears to have affected the outcome of the trial.” Slip op. at 8, citing 
Tzystuck v. Chicago Transit Authority
, 124 Ill. 2d 226, 243 (1988). Clearly, the evidence at issue meets that standard. Gunn’s testimony that the sale was a sham and that he never received payment for the coins was a crucial piece of evidence at the trial, and it is questionable whether the trial court would have reached the same conclusion without that evidence. In my view, that is all we need to say. This is essentially the way the appellate court disposed of the case. Once the court determined that Gunn’s testimony about the transaction had been improperly admitted, it simply reversed and remanded for a new trial. 352 Ill. App. 3d at 788.

Justice Karmeier, by contrast, sifts through all of the evidence and determines who should win the case once Gunn’s testimony is excluded. In this section, Justice Karmeier finds facts, weighs the evidence, draws inferences and conclusions, and instructs the trial court as to how it should view the evidence. See, 
e.g.
, slip op. at 9 (“there would have been no reason to expect the Sobuckis to preserve bank records for such a long period of time,” “[i]t is not uncommon for a seller, upon seeing the buyer with the goods at some future time, to inquire about the goods in a manner, which to an outsider, would seem to reflect that the goods still belong to the seller”); slip op. at 10 (“[t]he reasonable inference is that the reason Mr. Sobucki bought the collection was simply to help Gunn out,” “there was nothing remarkable about Mrs. Sobucki’s evasiveness when Gunn and investigators he hired attempted to ascertain the status of the coin collection,” “[s]uch emotions are entirely understandable, especially considering that Mrs. Sobucki was elderly, had recently lost her husband and was living alone”); slip op. at 11 (“Gunn was obviously an avid coin collector, and it is entirely possible that he had additional coin sets acquired later,” “[a] far more plausible explanation for the sham, if a sham there was, is that Gunn was simply attempting to prevent his wife from sharing in the coin collection’s full value when their property was divided in the dissolution proceedings”). To be sure, Justice Karmeier assures the trial court that he is merely providing guidance, not prejudging the case, and that the decision is still up to the trial court. Slip op. at 13. It is not realistic, however, to say that the trial court is still free to make its own decision, after three justices of the supreme court have thoroughly detailed how the facts should be viewed and what inferences should be drawn from them. The lead opinion deprives plaintiff of his right to have the trier of fact determine these matters in the first instance. Thus, while I agree with Justice Karmeier that this case must be remanded for a new trial, I do not join in the fact-finding that follows this conclusion.

JUSTICES FREEMAN, FITZGERALD and KILBRIDE join in this special concurrence.

FOOTNOTES
1:     
1
 “Section 1 of the law of 1867 provides that parties to the record, and in interest, may testify (changing the old common law rule that interested parties could not testify). Section 2 of the same act declares that “no party to any civil action, suit or proceeding, or person directly interested in the result thereof, shall be allowed to testify therein of his own motion, or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as *** heir, legatee or devisee of any deceased person, *** except in certain specified cases [provided by section 3 of the Act] ***.” 
Alexander v. Hoffman
, 70 Ill. 114, 117 (1873) (summarizing the predecessor to the modern Dead-Man’s Act, the Act of 1867).