2026 IL App (1st) 240738

SECOND DIVISION
June 16, 2026

No. 1-24-0738

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* ESTATE OF EDWARD HEGNER, Deceased | ) | |
| | ) | Appeal from the Circuit Court of |
| (Colin Lateano, | ) | Cook County, Illinois |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | Nos. 2017 L 50735 and 2016 P 7861 |
| v. | ) | (Consolidated) |
| | ) | |
| Margaret Murin, Individually and as Administrator, | ) | |
| and Thomas Hegner, | ) | Hon. Kent Delgado, |
| | ) | Judge Presiding |
| Defendants-Appellees). | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice McBride concurred in the judgment and opinion.

## OPINION

¶ 1     In November 2016, Edward Hegner died intestate—that is, without a will. His sister,
defendant Margaret Murin, was the administrator of Ed's estate. Plaintiff Colin Lateano, age 25
at the time of Ed's death, filed a lawsuit, later consolidated with the probate case, in which he
claimed entitlement to a portion of Ed's estate on the theory of equitable adoption, a doctrine
first recognized by our supreme court in *DeHart v. DeHart*, 2013 IL 114137, ¶ 60.

¶ 2     Colin demanded a jury trial. Defendants—Margaret, both as administrator and in her
personal capacity as an heir to the estate, plus her brother Thomas Hegner, also an heir—
objected, claiming Colin had no right to a jury trial. The trial court agreed and struck Colin's jury

demand. After a lengthy trial, including a ruling that barred much of Colin's testimony under the Dead-Man's Act, the trial court entered judgment for defendants and against Colin.

¶ 3   Colin appeals, claiming he had a constitutional right to a jury trial and that the court erred in barring his testimony. We find no error and affirm the judgment.

¶ 4                                    BACKGROUND

¶ 5                          I. Overview of Equitable Adoption

¶ 6   For context, we start with a brief explanation of equitable adoption, first recognized by our supreme court in *DeHart*. See *id.* "Essentially, the doctrine of equitable adoption allows a person who was accepted and treated as a natural or adopted child, and as to whom adoption typically was promised or contemplated but never performed, to share in the inheritance of the foster or stepparent." *In re Parentage of Scarlett Z.-D.*, 2015 IL 117904, ¶ 48.

¶ 7   Equitable adoption "is a probate concept to determine inheritance and does not apply to proceedings for parentage, custody, and visitation." *Id.* ¶ 52. It does not "create the legal relationship of parent and child, with all the legal consequences of such relationship, nor is it meant to create a legal adoption." *Id*. ¶ 53.

¶ 8   The claim requires more than mere proof "that a familial relationship existed between the decedent and the plaintiff" or that, "from an age of tender years, [the plaintiff] held a position exactly equivalent to a statutorily adopted child." *DeHart*, 2013 IL 114137, ¶ 59. Rather, the plaintiff must show "an intent to adopt" and that "the decedent acted consistently with that intent by forming with the plaintiff a close and enduring familial relationship." *Id.*

¶ 9   A plaintiff proves such intent "by showing that the decedent represented to the plaintiff and the community at large that the plaintiff was the decedent's natural or legally adopted child." *Id*. ¶ 60 (internal quotation marks and emphasis omitted). Beyond that, our supreme court

"envision[ed] a case where *** a decedent had held out the plaintiff his whole life as his or her natural child, never even letting it be known throughout the childhood of the plaintiff that the child was not the natural offspring of the deceased." *Id.*

¶ 10    In response to concerns that this doctrine would deter foster and stepparents with no intent to adopt from taking orphans or stepchildren into their homes or providing kindness and compassion to children who were not theirs by blood, the supreme court made two points. First, the court emphasized "the limited nature of our holding—only in those cases where there is sufficient, objective evidence of an intent to adopt ***, supported by a close enduring familial relationship, will an equitable adoption be recognized." *Id.* ¶ 62 (parenthetical in original).

¶ 11    And second, the court heightened the standard of proof, noting that "if too lax a standard were created it could create a danger that a person could not take in a child in need without having a *de facto* adoption perpetrated upon him after his death." *Id.* ¶ 64. Thus, "[w]hen the lips of a deceased person who is alleged to have intended an adoption are sealed by death, proof of the facts necessary to invoke principles of equity should be *clear, unequivocal and convincing*." *Id*. (emphasis added).

¶ 12                                II. Factual Background

¶ 13    With that said, we discuss the evidence at trial, which spanned multiple days spread over several months. Colin doesn't challenge the sufficiency of the evidence, so we can be brief.

¶ 14    Colin is the biological child of Shirley Lateano and a man who was not interested in being a father to Colin (though he paid court-ordered child support and included him in his will at Shirley's behest). Shirley testified that she never told Colin, as a child, about his true biological father. She told others that her son was conceived via *in vitro* fertilization.

¶ 15   Ed and Shirley never married. They began dating while Shirley was pregnant with Colin, who was born in September 1991. Shirley lived with her mother at the time; Ed lived in Palos Heights (the record at times refers to Palos Hills; we will leave it at "Palos"). Ed was involved in the day-to-day care of Colin as an infant and toddler.

¶ 16   After the death of Shirley's mother, Ed became even more involved in caring for Colin and sometimes even stayed overnight at Shirley's house. When Colin reached sixth grade, Ed and Shirley bought a townhouse in Lincoln Park so Colin could attend a prestigious high school. Ed funded a prepaid-tuition plan that allowed Colin to attend the University of Illinois. Colin joined a fraternity as a "legacy" because Ed had been a member of the same fraternity during his own time in college. (The clear import of this evidence was that Colin could not have been a "legacy" unless he was identified as Ed's son.)

¶ 17   Though Colin's testimony was largely barred under the Dead-Man's Act, as we will discuss in detail below, Colin did make a lengthy offer of proof. In sum, Colin would testify that "he believed he was the biological son of Ed Hegner." He would testify that he remembers Ed from his earliest days, where Ed performed all the roles one might expect of a father: teaching him to read and tucking him in to bed; coaching his soccer team; serving as scoutmaster for his cub scouts troop; teaching him to golf and swim and play baseball; playing video games with him; driving him wherever he needed to go; helping him choose a college and communicating with him weekly during college. Colin would testify that "[u]p until he heard the news [that he had a different biological father after Ed's death], he knew in his heart and mind that his father was Ed Hegner."

¶ 18   The evidence shows that Ed attended all major events in Colin's life that one might expect—graduations, birthdays, holidays—and that he was sometimes introduced as Colin's

father without objection and sometimes introduced himself as such. The trial court found from the evidence that Shirley wanted the three of them (she and Ed and Colin) to be a family unit and that Ed largely accommodated her wishes. The evidence is clear that Ed loved Colin deeply.

¶ 19    The court also found, however, that insofar as Ed interacted with the community at large and with his own biological family, he did not hold out Colin as his son. He was not listed as Colin's father on any official documents—school contracts, birth and baptismal certificates, tax filings, or health records. He always maintained a separate residence in Palos and even convalesced there (or at his sister Margaret's home) after his two hip surgeries. He never told his close friends that Colin was his son and, in fact, told them Colin was *not* his son. At his retirement party, Colin was present, but Ed did not introduce him as his son. He told his close friend, Denise Boyle, that he had no intention of preparing estate documents, as he intended for his estate to go to his siblings, given that he was not married and had no children.

¶ 20    The court found that, while Ed loved Colin and was a "father figure" to him, Ed did not intend to adopt Colin, nor did he hold himself out to the community at large as Colin's father. The court noted that Shirley had sued the biological father for child support and even made him include Colin as a beneficiary in his will. Ed, in contrast, never made any attempt to adopt Colin or to prepare estate documents that would add him as an heir.

¶ 21    The court specifically found that Ed "went along with" Shirley's attempt to portray the three of them as a nuclear family but that, outside of Shirley and the people in her "orbit," Ed did nothing to indicate that he was the father of Colin or intended to adopt him. The court also noted that, while Ed would routinely give Colin greeting cards on special occasions which sometimes contained the preprinted word "son," Ed signed his name "Ed," not "Dad," to the cards. He also signed the name "Ed," not "Dad," in Colin's yearbook.

¶ 22    The court also did not find Colin's offer of proof credible. The court felt that Colin might have viewed Ed as his father when he was quite young, but the court found it difficult to believe that, as Colin grew up, he did not realize otherwise, given "the fact that Ed didn't live with him all the time, Ed had a different last name, he referred to himself in cards and in the yearbook as 'Ed' and not 'dad,' at some point, when Colin's in high school or when he's in college, I mean, it's possible that it didn't dawn on him but it probably did." The court did not find it credible "that the first time he found out was when he was going through—after Ed died."

¶ 23    In sum, the court did not find "clear, unequivocal and convincing" proof that Ed intended to adopt Colin or that he held himself out to Colin and the community at large as Colin's father. The court thus ruled in favor of defendants and against Colin. This appeal followed.

¶ 24                                    ANALYSIS

¶ 25    Colin claims that the trial court erred in striking his jury demand and in barring much of his testimony under the Dead-Man's Act. We take the issues in that order.

¶ 26                              I. Right to Jury Trial

¶ 27    The trial court ruled that Colin did not have the right to a jury. The court recognized that it had discretion to empanel one. See 735 ILCS 5/2-1111 (West 2024) ("The court may in its discretion direct an issue or issues to be tried by a jury, whenever it is judged necessary in any action seeking equitable relief."). But the court chose not to do so, thus striking the jury demand.

¶ 28    Colin says he had a constitutional right to a jury trial, and thus the court did not have discretion to deny his demand. As defendants are quick to note, Colin does *not* argue on appeal that the court abused its discretion in denying his demand under section 2-1111. So we are left only with the question of whether a constitutional right to a jury trial attaches to equitable-adoption claims, a legal argument we review *de novo*. *Prodromos v. Everen Securities, Inc.*, 389

Ill. App. 3d 157, 174 (2009); *Bank One, N.A. v. Borse*, 351 Ill. App. 3d 482, 488 (2004).

¶ 29    Our constitution provides that "[t]he right of trial by jury as heretofore enjoyed shall remain inviolate." Ill. Const. 1970, art. I, § 13. Illinois recognizes a right to a jury trial only for those actions "where such right existed under the English common law at the time the constitution was adopted." *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 72-73 (1994).

¶ 30    Unfortunately for Colin, "[t]here was then and there is now no constitutional right of trial by jury in equity." *Lazarus v. Village of Northbrook*, 31 Ill. 2d 146, 148 (1964); see *Martin v. Strubel*, 367 Ill. 21, 22-23 (1937) ("In this [s]tate the guaranty of the right to a jury trial does not extend to cases of equity jurisdiction."); *Shrock v. Meier*, 2024 IL App (1st) 230069, ¶ 37; *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 31; *Wolinsky v. Kadison*, 2013 IL App (1st) 111186, ¶ 108 (" 'At common law, equitable claims were creations of the courts of chancery and were tried without the right to a jury.' " (quoting *Borse*, 351 Ill. App. 3d at 488)); *Pettey v. First National Bank of Geneva*, 225 Ill. App. 3d 539, 547 (1992) ("There is no constitutional right to a jury in equity actions.").

¶ 31    And our supreme court has made clear that "the doctrine of equitable adoption is merely an equitable remedy." *Scarlett Z.-D.*, 2015 IL 117904, ¶ 53. "It is a limited remedial doctrine devised by courts using their equitable powers" to "correct the injustice that would result were the intestacy laws woodenly applied." *Id*. ¶ 52 (internal quotation marks omitted).

¶ 32    We would note, as defendants do, that Colin himself argued that equitable adoption was an equitable remedy when trying to persuade the trial court that the Dead-Man's Act was inapplicable to an equitable-adoption claim. He is hard-pressed to change position now. Regardless, as we explain below, we find no merit to his counter-argument.

¶ 33    Colin argues on appeal that equitable adoption is more akin to a cause of action known as

"contract-to-adopt," a legal claim grounded in a theory of contract, where a would-be parent attempted to adopt but did so invalidly under the adoption laws. He cites to our supreme court's decision in *DeHart*, claiming in his appellate brief that, "[a]fter carefully considering contract-to-adopt's long history in Illinois, and thoughtfully examining the doctrine of equitable adoption, *DeHart* found any difference between the cause of actions to be 'indiscernible.' "

¶ 34    Colin takes that language out of context. The court in *DeHart* noted that *some* states equated equitable adoption with contract-to-adopt, such that any difference between the two doctrines was "essentially indiscernible." *DeHart*, 2013 IL 114137, ¶ 52. But our supreme court did not adopt that approach; it adopted the approach of other states that recognized equitable adoption *without* requiring proof of an expressed or implied contract, based on notions of equity and fundamental fairness. *Id.* ¶¶ 53-59, 66.

¶ 35    There is more we could add, but we have said enough. In short, nothing in *DeHart* gives any reason to believe that equitable adoption is anything but an equitable doctrine. And the court's explicit language in *Scarlett Z.-D.* ends any debate on that topic. Colin had no right to a jury trial on his equitable-adoption claim.

¶ 36                            II. Dead-Man's Act

¶ 37    On defendants' motion, the trial court barred Colin from testifying about his interactions and conversations with Ed. The court did so based on the Dead-Man's Act, 735 ILCS 5/8-201 (West 2024). This statutory rule of evidence, subject to four exceptions, reads in relevant part:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took place in the presence of the deceased ***." *Id.*

¶ 38     The purposes of the Dead-Man's Act are "to protect decedents' estates from fraudulent claims and to equalize the position of the parties in regard to the giving of testimony." *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005). The point is "not to create a disadvantage for the living but to remove the temptation of the survivor of a transaction to testify falsely." *Fleming v. Fleming*, 85 Ill. App. 3d 532, 538 (1980). That is, the Dead-Man's Act " 'protect[s] decedents' estates from depletion based on perjured testimony since it was considered that a party would be prone to testify falsely when such testimony cannot be directly contradicted' " by the decedent. *In re Estate of Sewart*, 274 Ill. App. 3d 298, 306 (1995) (quoting *Fleming*, 85 Ill. App. 3d at 538). As our supreme court succinctly put it: "The Act bars only that evidence which the decedent could have refuted." *Gunn*, 216 Ill. 2d at 609.

¶ 39     Tracking the language of the statute, the circuit court found that Colin was a "person directly interested in the action" seeking to give testimony about "conversation[s] with the deceased" and "event[s] which took place in the presence of the deceased." 735 ILCS 5/8-201 (West 2024). It is all but impossible to disagree with that conclusion.

¶ 40     The issue truly joins at one of the four exceptions to the Dead-Man's Act, namely subsection (d): "No person shall be barred from testifying as to any fact relating to the heirship of a decedent." *Id.* § 8-201(d). The circuit court agreed with defendants that subsection (d) was inapplicable, as equitable adoption does not affect heirship; rather, it merely allows a non-heir to obtain a portion of an estate's distribution based on principles of equity.

¶ 41     The court's interpretation was consistent with the supreme court's explanation in *Scarlett Z.-D.*, 2015 IL 117904, ¶ 48, that equitable adoption does not alter the status of the parties but merely permits a child who was never adopted "to share in the inheritance of the foster or stepparent." The doctrine does not "create the legal relationship of parent and child, with all the

legal consequences of such relationship" but merely "correct[s] the injustice that would result were the intestacy laws woodenly applied." *Id*. ¶¶ 52-53 (internal quotation marks omitted).

¶ 42    Simply put, even had Colin prevailed, he would not have become an heir. That stands in marked contrast, for example, to a woman testifying that she married the decedent before his death, testimony that (if accepted) would have made her an heir to the estate. See *In re Estate of Bailey*, 97 Ill. App. 3d 781, 782-83 (1981) (applying earlier version of subsection (d) exception).

¶ 43    As both defendants and the circuit court noted, other aspects of probate law distinguish between heirship status and the right to a distribution from an estate. For example, the "slayer" statute provides that an heir is not entitled to a distribution from the estate if he or she intentionally and unjustifiably causes the decedent's death. 755 ILCS 5/2-6 (West 2024); see *In re Estate of Ivy*, 2019 IL App (1st) 181691, ¶ 34. Likewise, an heir who is convicted of abuse or neglect of the decedent may not collect a distribution from that estate. 755 ILCS 5/2-6.2 (West 2024); see *In re Estate of Lewy*, 2018 IL App (1st) 172552, ¶ 8. These individuals do not lose their status as heirs; they are simply deemed ineligible for inheritance based on their conduct.

¶ 44    We understand that there is little practical difference to Colin between receiving an inheritance as an heir and receiving one as a non-heir via an equitable remedy. But the difference remains a real one. His proffered testimony simply does not fit within the wording of subsection (d) of the Dead-Man's Act.

¶ 45    Colin understandably finds this result harsh. How, he asks, can he be expected to satisfy the proof that Ed held himself out to Colin as his son if he cannot testify what they said to each other and experienced together? He notes that the exception found in subsection (d) was added to in 1973 in response to Illinois courts decrying the harsh results of people being barred from testifying to facts that would establish their status as heirs. We have three responses.

¶ 46    First, this law must *always* feel harsh to someone barred from testifying about his or her conversations and interactions with the decedent, as that party is usually in the best position of anyone—anyone alive, at least—to testify on first-hand knowledge. The legislature balanced that consideration against the associated risk that it would be all too easy for parties to perjure themselves, knowing that the decedent cannot contradict them. See *Gunn*, 216 Ill. 2d at 609. Whatever a panel of judges may think of this law, we are in no position to second-guess that legislative judgment. See *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 56 (2011) ("[w]hen the legislature has declared, by law, the public policy of the State, the judicial department must remain silent" (internal quotation marks omitted)).

¶ 47    Second, much of Colin's offer of proof, which we summarized above, was introduced through his mother and Ed's longtime girlfriend, Shirley. Shirley testified about Ed's interactions with her and Colin throughout Colin's lifetime. For example, Ed fed and rocked and dressed Colin as an infant; was present at the baptism; spent birthdays and holidays with Colin and her; read to Colin and played with toys with him; always spent Christmas Eves with them but sometimes spent Christmas Day at his sister's.

¶ 48    When Shirley, a United Airlines flight attendant, was away for work, Ed would step in and care for Colin, especially after Shirley's mother died when Colin was four. Ed helped with Colin's homework; they shopped and played sports together. She authenticated a birthday card (one of many introduced at trial) from 1988 when Colin turned seven that read, "I love you. You're the best. Love, Ed." Ed paid for much, if not all of Colin's education. Colin lived with Ed and Shirley after they bought the townhouse in Lincoln Park.

¶ 49    No doubt, there were private moments between Colin and Ed to which Shirley could not testify. But her testimony largely covered the same topics. So while we agree that the Dead-

Man's Act can lead to harsh results, it is also fair to say that Colin was not the only witness who could competently testify to Colin's relationship with Ed; Shirley covered much of that ground.

¶ 50    And finally, to Colin's point that the legislature sought to avoid unfair applications of the Dead-Man's Act by amending it in 1973 to add the "heirship" exception: at least two courts have agreed with him that the exception was added in response to the "harsh" results emanating from a line of case law beginning with our supreme court's decision in *Laurence v. Laurence*, 164 Ill. 367, 373 (1896), where the court held that the Dead-Man's Act barred a woman from testifying that she married the decedent and was thus an heir to his estate. *In re Estate of Hutchins*, 120 Ill. App. 3d 1084, 1087 (1984); *Estate of Bailey*, 97 Ill. App. 3d at 783-84.

¶ 51    But Colin's point proves ours; it is not for a court to re-write or amend a statute we do not like. It is for the legislature. The General Assembly is free to amend subsection (d) or create a new exception for claims relating to equitable adoption, but it is not our place to do it ourselves, whatever we may think of this statute. *People v. Dobbins*, 2024 IL App (1st) 230566, ¶ 26 ("we must interpret the statute as written, not rewrite it to reach an outcome we would prefer"), *aff'd*, 2026 IL 131187; *People v. Moore*, 2020 IL App (1st) 190435, ¶ 42 (same).

¶ 52    The circuit court did not err in barring Colin's testimony under the Dead-Man's Act.

¶ 53                                CONCLUSION

¶ 54    There is no dispute here that Ed loved Colin dearly. No piece of paper or judicial ruling will ever change that. Our only role is to answer two legal questions. Having found no error in the trial court's ruling on either question, we affirm the court's judgment.

¶ 55    Affirmed.

*In re Estate of Hegner*, **2026 IL App (1st) 240738**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 2016-P-7861, 2017-L-50735; the Hon. Kent Delgado, Judge, presiding. |
| **Attorneys for Appellant:** | Stephen M. Komie and Brian E. King, of Komie and Associates, and Thomas M. Paris, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | James G. Riley and Kathryn T. McCarty, of FMS Law Group LLS, of Chicago, and Michael Penosky and Kirsten A. Casas, of Huck Bouma, PC, of Wheaton, for appellees. |