2020 IL App (1st) 191271-U

Nos. 1-19-1271, 1-19-1646, 1-19-1766 (cons.)

Fourth Division
Modified order filed November 5, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| | ) | |
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the Circuit Court |
| CATHY McCORMICK, | ) | of Cook County. |
| | ) | |
| Petitioner-Appellant, | ) | No. 2007 D 2300009 |
| | ) | |
| and | ) | The Honorable |
| | ) | Jeanne Cleveland Bernstein, |
| ANTHONY McCORMICK, | ) | Judge Presiding. |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Hall and Lampkin concurred in the judgment.

**ORDER**

¶ 1     *Held:* The trial court's judgment is affirmed, where (1) the "affidavit" of appellant's son was admissible for impeachment purposes, and any substantive use of the affidavit was harmless; (2) appellant has forfeited any challenge to the use of the affidavit as an outline to her son's testimony and, even if not forfeited, its use was not error; (3) the trial court's finding of cohabitation was not against the manifest weight of the evidence; (4) the trial court did not act outside the scope of its jurisdiction by finding appellant "guilty of witness tampering"; and (5) the trial court did not err in awarding attorney fees.

¶ 2    The instant consolidated appeals arise from the trial court's finding that appellant Cathy McCormick was cohabitating with another man, resulting in the termination of appellee Anthony McCormick's maintenance obligation to her. Cathy appeals, claiming that Anthony's key witness—their son, Ryan—should not have been permitted to testify from an "affidavit" prepared by Anthony, and further claiming that the trial court's finding was against the manifest weight of the evidence. Cathy also claims that the trial court erred in finding that she had tampered with a witness and in awarding Anthony attorney fees. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4    Cathy and Anthony were married in 1988, and had two children: a daughter born in 1991 and a son born in 1993. In 2007, Cathy filed a petition for dissolution of marriage and a judgment for dissolution of marriage was entered on January 6, 2009. Under a marital settlement agreement incorporated into the judgment for dissolution of marriage, Anthony was to pay Cathy maintenance and child support, the amount of which was modified from time to time.

¶ 5    On March 7, 2017, Anthony filed a "Petition to Determine Cohabitation, Terminate Maintenance and for Other Appropriate Relief" (petition to terminate maintenance), alleging that Cathy had been cohabitating on a "resident, continuing conjugal basis" with a man named Michael Castagna since January 1, 2015, and that the two had lived together at Cathy's residence in California since that date. Anthony alleged that the relationship began prior to 2009, while Anthony and Cathy were still married, and that the two spent all of their time together, including vacationing and spending holidays together. Anthony requested an order terminating Cathy's maintenance, ordering her to reimburse Anthony for any maintenance

payments after January 1, 2015, and an award of attorney fees because Cathy had concealed her cohabitation.

¶ 6    In response, Cathy denied that she was cohabitating with Castagna. Cathy alleged that in March and April 2014, she was severely ill, and was eventually diagnosed with Lyme disease, which left her unable to care for herself without assistance. Consequently, beginning in June 2014, Castagna, her "platonic friend and now business partner," traveled from Illinois to California and acted as a part-time caretaker during the day to assist her with her daily needs in conjunction with a different caretaker who assisted her overnight. Cathy's health improved in March 2015, and Castagna returned to his home in Winnetka.

¶ 7    Cathy claimed that she and Castagna had a romantic relationship from 2009 until 2011 that terminated when she moved to California, and that they had maintained a platonic friendship. Cathy and Castagna were also business partners in CatherineGraceO Enterprises, which they created in December 2015, and Cathy claimed that any trips she had taken with Castagna were business trips. Cathy further claimed that she had been involved in other dating relationships since 2011, and that Castagna had been involved in a long-term monogamous relationship with another woman in Winnetka from 2013 through 2015.

¶ 8    The parties engaged in discovery and, on February 7, 2018, Anthony filed a motion seeking, among other things, discovery sanctions against Cathy for "Coercion and Intimidation of a witness." Anthony claimed that the parties' adult son, Ryan, was his "key witness" and had executed an affidavit detailing his personal observations about Cathy's cohabitation with Castagna. Anthony further claimed that, since he disclosed the affidavit to Cathy, "she has repeatedly taken actions calculated to convince Ryan not to testify at the hearing in this matter," including sending him text messages; insisting on taking his deposition in Boston, despite his

willingness to travel to Chicago, and arriving early to meet with him privately; asking irrelevant and harassing questions at the deposition; calling one of his close friends to ask if he would testify against Ryan; issuing a subpoena, later quashed, to Google for all of his personal e-mails; and personally contacting his college, without a subpoena, in an attempt to gain his school records. Anthony asked that Cathy be sanctioned "for her clear abuse of the discovery process and attempts to intimidate Anthony's witness, Ryan, into not testifying and to harass him." On April 24, 2018, the trial court entered an order finding that "[Cathy] attempted to intimidate a witness in this matter—Ryan McCormick" and barred her from "further intimidating Ryan and otherwise discussing this case with Ryan." The court's order further provided that "[a] determination of whether sanctions will be issued in connection with each count of Anthony's [motion] is hereby reserved until final hearing on Anthony's Petition to Terminate or Modify Maintenance and for Other Relief."

¶ 9        The parties came before the trial court on Anthony's petition to terminate maintenance over a number of dates, beginning on September 14, 2018, and concluding on April 11, 2019. Both Anthony and Cathy testified on their own behalf and as adverse witnesses. Additionally, Anthony called as witnesses (1) Michael Goodman, a private investigator, and (2) Ryan, while Cathy called as witnesses (1) Geoff Moore, a man who Cathy dated, (2) Jay Mitchell, the manager of the building in which Castagna leased an apartment, and (3) Castagna. While the witnesses' testimony was sometimes taken out of order or divided among multiple hearing dates, we discuss the testimony in the general order in which it was presented.

¶ 10       Michael Goodman testified, on behalf of Anthony, that he was a private investigator in California, and had been retained by Anthony's attorney to determine if Castagna resided at a particular address on Catalina Avenue in Redondo Beach, California, which was a two-story

4

condominium building. Goodman testified that he conducted surveillance for five days by parking in a spot where he had a view of the door to the residence; he did not believe that either Cathy or Castagna noticed his presence. On February 20, 2017, he observed Cathy leaving the residence and did not observe anyone else entering or leaving the residence that day. After Cathy left, Goodman approached the door and knocked; a man fitting Castagna's description answered the door. At the hearing, Goodman identified a photo of Castagna as the man who answered the door. Goodman testified that when Castagna answered, Goodman asked if "Justin" was there, and Castagna responded that he did not know a "Justin" and that " '[w]e've been living here since September.' " Goodman testified that he recorded this conversation on his phone and the audio recording was admitted into evidence over objection. Goodman also performed surveillance on February 21, 2017, and February 22, 2017, but did not observe Castagna either day. On cross-examination, Goodman testified that he was unaware that there were multiple entrances and exits to the building. He also searched online and discovered a different address for Castagna, but did not visit that address.

¶ 11    Ryan testified, on Anthony's behalf, that he was currently 25 years old and lived in Boston. He visited Cathy at her home in California five or six times between December 2014 and December 2016, and had a "[g]ood, normal relationship" with her at the time; however, Ryan testified that "I haven't had much of a relationship with her since the case started." Ryan testified that he knew Castagna, who was "[m]y mother's former boyfriend, I guess." He first met Castagna in 2008, around the time that Cathy and Anthony's marriage was dissolved, when Castagna was in a relationship with Cathy.

¶ 12    Ryan testified that he visited Cathy in California from December 20 to 28, 2016, and stayed at her residence on Catalina Avenue. During his visit, Cathy, Castagna, and, occasionally,

Ryan's sister stayed at the residence. Ryan testified that Castagna was staying there the entire time he was visiting, and Ryan observed Castagna sleeping in Cathy's bedroom, which contained only one bed. Castagna was also present on Christmas day, including for the exchange of gifts. Ryan testified that he believed that Cathy and Castagna were living together full-time and that "it seemed like they were still dating together." In January 2017, Ryan mentioned his observations to Anthony. Ryan testified that Cathy had previously asked him "fairly regularly" not to tell Anthony about Castagna, including in person and over the phone.

¶ 13     Ryan testified that, in February 2017, he had a conversation with Anthony and Anthony's attorney, during which he related his observations of Cathy and Castagna. In April 2017, Anthony sent Ryan an affidavit via e-mail, which Ryan signed. Ryan was shown the affidavit on the stand, and testified that it contained his signature and that all statements within it were true and accurate. Anthony's attorney then moved to admit the affidavit into evidence, and Cathy's attorney objected, claiming it constituted hearsay:

> "ANTHONY'S ATTORNEY: Move to admit Exhibit 3.
>
> CATHY'S ATTORNEY: Objection. It's hearsay.
>
> ANTHONY'S ATTORNEY: It goes to impeachment, your Honor.
>
> CATHY'S ATTORNEY: It doesn't go to impeachment. It's improper impeachment. You have to establish something to impeach first, 1; 2, I'll grant it with[in] the exception of a party admission of an opponent, which would be [Cathy's] statements made, to that extent; otherwise, it's clearly a statement by a declarant made outside of court being introduced for the truth of the matter asserted. He can testify to it.
>
> THE COURT: He is testifying to it.

CATHY'S ATTORNEY: That's right. He doesn't have to introduce an affidavit.

THE COURT: It's the same thing. What is the difference?

CATHY'S ATTORNEY: One is an out of court statement.

THE COURT: That he is testifying to now that he did it and it's factual, and I'm going to admit it.

\*\*\*

ANTHONY'S ATTORNEY: Thank you, your Honor.

CATHY'S ATTORNEY: Can I get an explanation on how it's not hearsay, your Honor?

THE COURT: Next question."

¶ 14    After the admission of Ryan's affidavit, Anthony's attorney proceeded to question Ryan about statements made in the affidavit. Ryan testified that in March 2017, after Anthony had filed the petition to terminate maintenance, Cathy contacted Ryan and told him that if he was asked about the matter, "it would be best to say I don't know or I don't remember." Ryan further testified that he believed that Castagna had moved in on January 1, 2015, because "[t]hat is what my mom had told me, I believe."

¶ 15    Ryan testified that he visited Cathy on December 23 and 24, 2014, and that he observed Castagna living with her at that time. Additionally, Ryan testified that Cathy and Castagna took trips together and, "[e]ssentially any time I would be home for spring break or not just Christmas break they would always be together or doing things together." Ryan testified that he spent spring break of 2014 and 2015 with Cathy, and that Castagna was present for both.

¶ 16    Ryan testified that he believed their relationship was monogamous because Cathy had told him that she would be asked on dates, but that she would decline "because she didn't want to

7

hurt [Castagna] or at that time was still essentially together with [Castagna], I guess." Ryan was asked whether Cathy had ever informed him of a relationship with a man named Patrick Naritel, and he testified that he knew that Naritel was Cathy's friend and that she had wanted to date him in late 2014 or early 2015, but did not because of Castagna.

¶ 17    Ryan testified that he was aware that Castagna worked with Cathy as the photographer for her business. Ryan further testified that he believed that Cathy was financially supporting Castagna between December 2014 and December 2016 "[b]ecause I believe she basically told me that. It was kind of a known thing between my sister and I, that that was the case." Ryan was asked why he stated in his affidavit that he felt "uncomfortable" about Cathy and Castagna's relationship, and testified that "[i]t was uncomfortable for me because it seemed the exact same as when they were openly in a relationship, and they were both denying being in a relationship, but to me it didn't seem any different." Ryan was then asked about a statement he made in the affidavit in which he claimed that Cathy's actions had placed him in an uncomfortable situation. Cathy's attorney interjected:

"CATHY'S ATTORNEY: I'm sorry. Is he reading from the affidavit?

ANTHONY'S ATTORNEY: I've been walking him through the affidavit the whole time.

CATHY'S ATTORNEY: Forget it. I don't have an objection."

Ryan then testified that he felt uncomfortable because "I just wasn't comfortable with lying about that sort of thing."

¶ 18    Ryan testified that on March 23, 2017, Cathy called him and warned him that if he testified, her attorneys would "destroy" him and "bring out personal information" about him, such as his use of marijuana. When Ryan was deposed by Cathy's attorney on October 24, 2017, he

was asked about his marijuana use and about whether he had fraudulently used Cathy's credit card. Cathy also sent a subpoena to Google for his personal e-mails and contacted his college. Cathy also contacted several of Ryan's friends. Cathy also insisted on deposing Ryan in Boston, on a day when she knew that he had tickets to an all-day concert, even though he was willing to travel to Chicago.

¶ 19    A number of text messages between Cathy and Ryan were admitted into evidence, and Ryan was questioned about them. Ryan testified that several of the text messages referenced Castagna's presence. Ryan was asked about text messages in which he told Cathy that he did not intend to testify in the case, and testified that at that point, "[i]t was still very early on in the case, and I've never been involved with anything like this before." At the time he sent the messages, he was hoping that he would not be required to testify. Ryan further testified that he "felt like [Cathy] was pushing me not to testify" through comments suggesting that without him, Anthony had no case. Ryan was also asked about text messages in which he told Cathy that he " 'had no idea [his affidavit] would be used as the main evidence in this case and I really don't agree with the things said in it.' " Ryan testified that, at the time, he was trying to maintain a relationship with both of his parents and "[i]t really wasn't so much that I disagreed with anything. I just wanted the opportunity to better explain myself, but I couldn't do that clearly." Ryan testified that Anthony never threatened to withhold financial support from Ryan if he refused to testify; Anthony was currently paying $500 per month toward Ryan's rent.

¶ 20    On cross-examination, Ryan testified that he knew that Cathy and Castagna worked together and that the business was run out of Cathy's residence. Ryan further testified that he had observed them working together and had observed photo equipment at Cathy's residence. Ryan also testified that Cathy was ill with Lyme disease in 2014 and remained in bed when he

9

visited her over spring break. He observed that she had lost significant weight and was lethargic. He and Castagna both helped Cathy with her day-to-day activities. Cathy informed Ryan that Castagna was there to assist her.

¶ 21 Anthony testified, both on his own behalf and as an adverse witness, that he filed the petition to terminate maintenance in March 2017 after having a conversation with Ryan after Ryan returned from visiting Cathy over Christmas and after hiring a private investigator. Anthony testified that he did not threaten Ryan or offer him money to obtain his affidavit. Anthony admitted that he did not have any personal knowledge as to the allegations of cohabitation in the petition.

¶ 22 Cathy testified, both on her own behalf and as an adverse witness, that she currently lived on Catalina Avenue in Redondo Beach, California. Cathy admitted that she previously had a four-year romantic relationship with Castagna, which began while she was still married to Anthony. Cathy testified that she ended the relationship when she moved to California in 2011 and that she had romantic relationships with other men after her relationship with Castagna had ended, including with a man named Patrick Naritel. However, during her deposition, Cathy did not mention having been in a relationship with Naritel.

¶ 23 Cathy testified that, in April 2014, she was diagnosed with Lyme disease. Prior to her diagnosis, she had also suffered from other ailments, including spinal meningitis, and had surgery to have her colon resected. She had also suffered from sleep issues resulting from post-traumatic stress disorder, which led to the prescription of powerful sleep medicine, which she visited a treatment center to safely discontinue in March 2014. Cathy testified that her health issues resulted in an inability to function. From June 2014 to December 2015, she lived in a three-bedroom house on Steinhart Avenue in Redondo Beach, and had people "who helped

take care of me" staying at the house, including Castagna. Cathy testified that Castaga was not a certified caretaker, but that he had caretaking experience from assisting his father, who worked with handicapped children. Cathy could not afford a live-in caretaker, which would have been "very, very expensive" and was not covered by her insurance. Cathy testified that Castagna stayed in her home from June until September 2014, after which he rented his own apartment before leaving California in March 2015. She did not compensate Castagna for his caretaking services, but she paid for food and all of her expenses. In addition to Castagna, she hired her dog walker to assist her on evenings or weekends when Castagna was not present. It took until the summer of 2015 before Cathy was strong enough to no longer require a caretaker. At the end of December 2015, she moved to an address on The Strand in Hermosa Beach, where she lived for nine months before moving to her current residence. When Castagna moved to California permanently, he moved into a different apartment in the same building. In September 2016, Cathy moved into her current residence on Catalina Avenue. Cathy testified that she was the only person listed on all of her leases and paid all of the bills.

¶ 24    Cathy testified that she had several businesses that all operated under the umbrella of Catherine Grace O, LLC. She testified that she began with a blog in which she created sponsored posts promoting brands. After some of those brands asked her to create video content, she branched out to include a media production company. She also ran events and operated a podcast and talk show. Cathy testified that she had 40 to 50 clients. Cathy further testified that Castagna was the photographer for her business and also served as her business manager. The business was operated out of her home, with an office and production studio set up upstairs. The business originally had only Cathy and Castagna as partners, but now included a third partner who owned a 10% share of the business. Cathy testified that her business filing

11

for her company listed the Catalina Avenue address for both her and Castagna, because it was also the business address. Cathy testified that there was a subpoena in the instant litigation sent to her home but addressed to Castagna, which she began signing for before she realized it was not addressed to her, at which point she stopped.

¶ 25    Cathy testified that the business had a business bank account with Chase Bank and that both her name and Castagna's name were listed on the business account. She paid Castagna a salary by writing checks from the business account unless she had cash flow issues, in which case he did not get paid. Cathy testified that she also had personal bank accounts at Citibank, North Shore Community Bank, and Chase Bank. She did not make any payments to Castagna from those accounts, and he was never added to those accounts. Cathy also had a life insurance policy, on which her children were the beneficiaries.

¶ 26    Cathy testified that she took business trips in connection with her business, and that Castagna accompanied her on some of these trips. The trips were paid for through the business account. Cathy testified that sometimes she and Castagna stayed in the same room, but in separate beds. She had not taken any personal trips or vacations since January 2014.

¶ 27    Cathy denied that she attempted to pressure Ryan not to testify. Cathy further testified that Ryan visited her over Christmas in 2016, but denied that Castagna was present the entire time, as Ryan had claimed. However, during her deposition, Cathy had testified that Castagna was present every day of Ryan's visit, including on Christmas. Cathy testified that, at the time, Castagna maintained a different residence approximately eight minutes away. Cathy testified that Castagna slept at her home on Christmas because he had been drinking, and that he did not own a vehicle; Cathy testified that she typically drove him. On occasion, Castagna would drive Cathy's vehicle for work; he also drove the vehicle once during Ryan's visit when they

went out to eat. Cathy testified that when Castagna slept over during Christmas, he slept in her room on an air mattress.

¶ 28    Cathy testified that Ryan came to visit her over Christmas in 2014 and that Castagna was living with her at the time at an address on Steinhart Avenue in order to take care of her due to her health issues. Cathy testified that she was worried that Ryan would inform Anthony of Castagna's presence.

¶ 29    Cathy testified that, in August 2016, she posted a birthday message for Castagna on Facebook, consisting of a photo of Castagna and Cathy's dog taken in Arizona in 2011 and a caption referring to Castagna as " 'one of the most amazing men I have ever known.' "

¶ 30    Geoff Moore testified, on behalf of Cathy, that he had known Cathy since 2013, when they had children in the same school in Winnetka. Moore testified that he had a romantic relationship with Cathy in the summer of 2015 and again in November 2015, when Cathy visited Chicago.

¶ 31    Jay Mitchell testified, on behalf of Cathy, that he owns and manages an apartment building on The Strand in Hermosa Beach, California. Cathy rented an apartment in his building from December 2015 until the fall of 2016. Castagna also rented an apartment in the same building, beginning in December 2015, and currently remained a tenant. Mitchell testified that Castagna's apartment was a single-room, 200-square-foot apartment, and did not have a shower within the apartment, but that there was a shower directly across the hall. Mitchell issued one key per tenant, which could not be duplicated, and issued only one key to Cathy and one key to Castagna. Mitchell testified that he had observed Castagna at the apartment building, including in the evenings.

¶ 32    Castagna testified, on behalf of Cathy, that he and Cathy began dating after she filed her petition for dissolution of marriage in 2007 and continued dating until early 2011. Castagna learned that Cathy had been diagnosed with Lyme disease in May 2014, and traveled to California to assist her. He had intended to be there only briefly, but Cathy began having daily seizures and "was really incapable of doing anything for herself," so he ended up staying off and on through March 2015. At first, he stayed with her, but eventually, it grew too difficult, so he moved to his own apartment and assisted Cathy during the day, while another friend assisted during the night shifts. Castagna testified that he did not have any caretaking experience.

¶ 33    Castagna testified that he moved back to California in 2015 after returning to Illinois and he and Cathy decided to go into business together. Cathy's business involved a great deal of photography, which was expensive, so they decided that they would be able to save substantial money if Castagna was able to take photos. Castagna testified that he and Cathy both had debit cards for the business, but that neither had ever charged personal expenses to the business.

¶ 34    Castagna testified that one day in mid-February 2017, he was working alone in the office in Cathy's home, when someone knocked on the door. He looked out the side window and observed "some guy fidgeting around in his pockets." Castagna did not recognize him, and testified that "he looked like somebody you really wouldn't be trusting." He opened the door slightly and spoke with the man briefly, telling him that they had been there since September; Castagna testified that "I meant we've been working there."

¶ 35    Castagna testified that he had dated other women since moving to California and was currently in a relationship with a woman named Karen.

¶ 36    After the parties rested, the attorneys presented closing arguments. At the beginning of his closing, Anthony's attorney stated:

> "To go through what's pending, your Honor, we have [Anthony's] Petition to Determine Cohabitation and to Terminate Maintenance filed March 7, 2017. This case has been pending for over two years. We have [Anthony's] Motion to Compel which was filed earlier in this case and a court order continuing our fee request from that granted motion to trial. We have [Anthony's] [Second] Motion to Compel, again an order continuing the sanction and fee request to trial. We have pending per your Honor's August 20th, 2018 court order pending potential sanctions against Cathy's attorneys. We also have the June 8th, 2018 order from your Honor *** stating that your Honor may take a negative inference relating to Mr. Castagna. We, obviously, have our Motions in Limine that were dealt with in part during this case.
>
> And the final thing is our Petition for Contribution to Fees from Cathy."

At the end of his closing, in setting forth the relief sought, Anthony's attorney concluded:

> "And the final request is sanctions and fees against Cathy and her attorney, including discovery sanctions, a 508B finding against Cathy for unnecessarily increasing fees and improper conduct, including intimidating our main witness and her son, a 219C collusion with Mr. Castagna, improper filings, and under 508B, the fact that we had to enforce the Judgment against her relating to this cohabitation."

¶ 37    On June 4, 2019, the trial court entered a written order on Anthony's petition to terminate maintenance. The court found that Ryan testified "in a credible manner" as to Cathy and Castagna's living arrangements, and that there was "no question" that Cathy and Castagna "have a very close permanent relationship." The court further found that "Cathy was

15

impeached several times during her testimony and lied on several more occasions. She was not credible." The court found that "Cathy and [Castagna] have been in a very close relationship in which they rely on each other, spend all their time together, comingle funds in their business account, take many trips together and spend Christmases together." The court summarized its findings as follows:

> "Examining the documents tendered in this matter as well as observing the demeanor of the witnesses (including their attempts to avoid process), Cathy's acts of tampering with Ryan in an attempt to coerce him not to testify and [Castagna's] attempts to impose himself into the litigation through the pleadings, although only a witness, has convinced the court that Cathy and [Castagna] have been residing together [on] a resident, continuing conjugal basis."

The court also specifically found that "Cathy was not credible and that Anthony and Ryan were credible."

¶ 38　　Accordingly, the court ordered that Anthony's obligation to pay maintenance to Cathy terminated as of April 14, 2015, and ordered Cathy to repay any payments received from Anthony after that date. The court also found that "Cathy is guilty of witness tampering."

¶ 39　　On July 12, 2019, in response to a motion to clarify and to enter judgment amount, the trial court found that Anthony's maintenance obligation terminated on December 29, 2015, and that Cathy was required to reimburse Anthony $109,352 for maintenance paid after that date. The court order provided that "[t]he June 4, 2019 Memorandum Order, as modified and clarified herein, is now final."

¶ 40 On August 14, 2019, in response to Anthony's request for attorney fees, the trial court entered an order requiring Cathy to contribute $93,000 toward Anthony's attorney fees and costs. In awarding the fees, the court found:

"Clearly [Cathy] was dishonest, was very abusive and intimidating of her son and, quite frankly, I didn't refer it to *** the State's Attorney for criminal charges, which were appropriate, because I was hopeful that they may be able to restore some kind of relationship between the two of them.

But I think a mother should be encouraging the son to tell the truth and under oath, rather than trying to keep him from testifying at all.

And I was very disappointed in her. I thought it showed a lack of character on her part.

But I don't know that I can punish her for her lack of character [and] dishonestly [*sic*] in that area, but I do think that the case as it laid out was very clear that she was cohabitating and did everything she could possibly come up with to delay the case and to *** obfuscate the truth of the matter.

And so I do think that she needs to pay some of these fees."

¶ 41 Cathy filed three separate notices of appeal: (1) appeal No. 1-19-1271 sought reversal of the trial court's June 4, 2019, order; (2) appeal No. 1-19-1646 sought reversal of the trial court's July 12, 2019, order; and (3) appeal No. 1-19-1766 sought reversal of the trial court's August 14, 2019, order. The three appeals were consolidated on September 24, 2019.

¶ 42                                                     ANALYSIS

¶ 43 On appeal, Cathy claims (1) that the trial court erred in permitting Ryan to testify from his affidavit, (2) that the trial court's finding of cohabitation was against the manifest weight of

the evidence, (3) that the trial court's finding of "witness tampering" was erroneous, and (4) that the trial court erred in awarding Anthony attorney fees.

¶ 44                                    I. Motion to Dismiss Appeals

¶ 45        Prior to considering the merits of Cathy's appeals, however, we must first discuss a motion to dismiss the appeals filed by Anthony that we ordered taken with the case. Anthony claims that, since the entry of the orders at issue on appeal, Cathy has been "flouting her obligations under the orders of the trial court below, for which she has been found in contempt while concealing herself in California." Specifically, while Anthony admits that Cathy has satisfied the portion of the judgment requiring her to reimburse Anthony $109,352 in maintenance payments, Anthony claims that Cathy has not yet satisfied the portion of the judgment requiring her to pay $93,000 for his attorney fees. Anthony claims that citation proceedings are ongoing, and that Cathy has been found in contempt for failing to appear before the trial court in connection with the proceedings, leading to a body attachment order. In her response to the motion, Cathy claims that she is challenging the citation to discover assets due to improper service, and that the proceedings before the trial court have been delayed due to the COVID-19 pandemic and it is unclear when they will resume.

¶ 46        Anthony argues that we should dismiss the instant appeals pursuant to *Garrett v. Garrett*, 341 Ill. 232, 234 (1930), an Illinois Supreme Court case in which the court considered a situation in which "a party adjudged in contempt of the trial court for failure to obey its orders who has removed himself beyond its process and concealed himself outside the state of Illinois, asks this court to entertain a new suit [citation] in which he attacks the final decree of the court which he is defying." The court dismissed the appeal, finding that "a party in contempt is not entitled to prosecute or defend an action when the nature of his contempt is such as to hinder

18

and embarrass the due course of procedure in the cause." *Garrett*, 341 Ill. at 234. However, we find the situation present in case at bar to be unlike that in *Garrett*, or in *In re Marriage of Timke*, 219 Ill. App. 3d 423 (1991), another case relied on by Anthony.[1] In both cases, the party fled the jurisdiction in order to evade compliance with the court order. While in the case at bar, Anthony claims that Cathy has similarly "concealed herself in California," all indications are that she is simply in her home, in a state in which she has lived for nearly a decade and in the same place in which she resided throughout the litigation at issue. Anthony has not shown any evidence to suggest that Cathy is intentionally concealing herself or has otherwise evaded process. We further note that, while we take no position on the propriety of any actions occurring after the filing of the notices of appeal in the instant case, the supporting record submitted by Anthony in support of his motion to dismiss indicates that Cathy is contending that she was not properly served with the citation to discover assets, which is a far cry from fleeing to the Cayman Islands, as occurred in *Timke*. See *Timke*, 219 Ill. App. 3d at 425. Accordingly, we decline to dismiss Cathy's appeals and proceed to consider the merits of her arguments.

---

[1] Anthony cites a third case in his motion: *In re Marriage of Hill*, 2015 IL App (2d) 140345. Anthony claims that, in that case, the Second District "dismissed an appeal because the husband had not only concealed himself beyond the court's reach, but had also failed to pay child support and attorney's fees payable to the wife, the very orders from which he had appealed." However, Anthony's position wholly misrepresents the holding in that case. While it appears that the original decision in *Hill* may have reached that conclusion, that decision was withdrawn and a new opinion was filed following a petition for rehearing. "It is well established that a withdrawn opinion has no precedential value because it does not express the views of the court." *People v. Jordan*, 103 Ill. 2d 192, 205 (1984). There is no excuse for the citation of an opinion that was withdrawn five years ago, and we are deeply troubled by Anthony's use of the case as though it remained good law and with no indication to this court of the subsequent history of the case. We strongly urge counsel to verify that cases used in arguments made to this court remain good law prior to citing them in the future.

¶ 47                                    II. Ryan's Affidavit

¶ 48        Cathy's first argument on appeal is that the trial court erred in permitting Ryan to "testify from a script," namely, from his affidavit, and that this error was so prejudicial to Cathy that it requires a new trial. A trial court's evidentiary ruling is a matter of discretion and will not be reversed absent a clear abuse of discretion. *In re Estate of Hoover*, 155 Ill. 2d 402, 420. A trial court abuses its discretion "only where no reasonable person could have agreed with the trial court's decision." *Werner v. Nebal*, 377 Ill. App. 3d 447, 454 (2007) (*Lawler v. MacDuff*, 335 Ill. App. 3d 144, 147 (2002)). However, "[w]here a case is tried by the court without a jury, as this one was, error in the admission of evidence is not grounds for reversal so long as there is sufficient competent evidence fairly tending to support the trial court's judgment." *Gunn v. Sobucki*, 216 Ill. 2d 602, 612-13 (2005). "A new trial should be ordered only when the evidence improperly admitted appears to have affected the outcome of the trial." *Gunn*, 216 Ill. 2d at 613.

¶ 49        In the case at bar, Cathy argues both that the affidavit should not have been admitted and that Ryan should not have been permitted to use it during trial as a "script." We address each argument in turn. As an initial matter, Cathy claims that the "affidavit" was not actually an affidavit at all. Our supreme court has explained that, under long-standing law, " '[a]n affidavit is simply a declaration, on oath, in writing, sworn to by a party before some person who has authority under the law to administer oaths.' " *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 493 (2002) (quoting *Harris v. Lester*, 80 Ill. 307, 311 (1875)). "[A]n affidavit must be sworn to, and statements in a writing not sworn to before an authorized person cannot be considered affidavits." *Roth*, 202 Ill. 2d at 494.

¶ 50    In the case at bar, we agree with Cathy that Ryan's "affidavit" is not an affidavit because it was not sworn to before an authorized person. While the document states that it is "sworn" in several areas, there is no indication that it was sworn to before an authorized person—there is no notary stamp or other indication of the presence of an authorized person. See *People v. Tlatenchi*, 391 Ill. App. 3d 705, 715 (2009) (holding that a proof of service signed only by the defendant did not constitute an affidavit because it was not sworn to before an authorized person). There is also no certification as permitted under section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2018)). Anthony contends that "[s]ince Ryan's affidavit was a recitation of his memory of events and recites that it was sworn under oath, it did not require notarization to serve its intended purpose as an affidavit." However, Anthony provides no support for his suggestion that a "sworn witness statement" is somehow exempt from "the traditional rule that notarization accompany an affidavit" (*Roth*, 202 Ill. 2d at 495). Accordingly, we cannot find that Ryan's "affidavit" was, in fact, an affidavit.[2]

¶ 51    However, the label placed on the document does not determine whether it was admissible or whether Ryan was permitted to use it during his testimony. Cathy contends that the document constituted inadmissible hearsay and that the trial court erred in admitting it. Hearsay is an out-of-court statement made by a declarant that is offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is generally inadmissible unless it falls within an exception. *People v. Lawler*, 142 Ill. 2d 548, 557. Furthermore, the presence of the declarant in court has no bearing on whether an out-of-court statement constitutes hearsay. *Lawler*, 142 Ill. 2d at 557.

---

[2] While this document does not satisfy the requirements of an affidavit, we nevertheless use the term to refer to it in our analysis, because that is the term used by the parties and by the trial court below.

¶ 52    In the case at bar, Anthony argues that there are several bases for admitting the affidavit. First, Anthony claims that it was admissible as a prior consistent statement. "In general, proof of a prior consistent statement made by a witness is inadmissible hearsay, which may not be used to bolster a witness's testimony." *People v. House*, 377 Ill. App. 3d 9, 19 (2007). However, there are two exceptions to this rule: (1) where a prior consistent statement rebuts a charge that the witness was motivated to testify falsely or (2) where a prior consistent statement rebuts an allegation of recent fabrication. *House*, 377 Ill. App. 3d at 19. In the case at bar, Anthony claims that the first exception applies because Cathy suggested that Ryan was motivated to testify falsely due to Anthony's financial support. However, under the first exception, the prior consistent statement is admissible "if it was made before the motive to testify falsely came into existence." *House*, 377 Ill. App. 3d at 19. See also Ill. R. Evid. 613(c)(ii) (eff. Oct. 15, 2015). Anthony does not explain how Ryan's motivations changed between the time of the affidavit (which is undated, but which testimony established was created in 2017) and the time of the hearing on the petition, and we therefore cannot find that Ryan's affidavit would be admissible as a prior consistent statement.

¶ 53    Anthony also claims that the affidavit was admissible for the purpose of impeachment. A witness may be impeached by any evidence that contradicts her or affects her credibility adversely, so long as the impeachment is not on a collateral matter. *Lakin v. Casey's Retail Co.*, 2018 IL App (5th) 170152, ¶ 62; *People v. Abrams*, 260 Ill. App. 3d 566, 579 (1994). Anthony claims that the affidavit contradicted Cathy's testimony concerning cohabitation and therefore constituted proper impeachment evidence. We note that, as Cathy points out, Ryan's testimony, including the admission of the affidavit, was presented prior to Cathy's testimony. Thus, at the time that the document was admitted, there was not yet anything to "contradict."

22

However, we agree with Anthony that this distinction is one without a real difference, as the proceeding was a bench trial and the parties frequently scheduled the presentation of their witnesses based on their availability. There was no question that Cathy was challenging Anthony's claims of cohabitation, so we can find no error in the trial court's allowing the affidavit prior to her testimony.

¶ 54    More problematic, though, is the way that the affidavit was used. While Anthony contends that the affidavit was used only for purposes of impeachment, the trial court appears to reference the affidavit in its order as substantive evidence. Specifically, the trial court found that, "[i]n both testimony *and via affidavit*, Ryan indicated that [Castagna] had permanently moved into Cathy's residence, on or about January 1, 2015, and that they have been living together since that time." (Emphasis added.) If the affidavit was used as substantive evidence, that was error. However, as noted, in a bench trial, "error in the admission of evidence is not grounds for reversal so long as there is sufficient competent evidence fairly tending to support the trial court's judgment." *Gunn*, 216 Ill. 2d at 612-13. In the case at bar, even if the affidavit was used as substantive evidence, the presence of Ryan's testimony, which related substantially the same facts as contained in the affidavit, provides competent evidence to support the trial court's judgment. Accordingly, we cannot find that the admission of the affidavit for purposes of impeachment was reversible error.

¶ 55    We next consider Cathy's claim that Anthony's counsel used the affidavit as a "script" to shape Ryan's testimony. While a witness may refer to documents to refresh his recollection prior to testifying, the witness must then testify from his independent recollection. *In re Estate of Frakes*, 2020 IL App (3d) 180649, ¶ 38. Cathy contends that the use of the affidavit resulted

23

in Ryan testifying from the affidavit, not from his own independent recollection. We do not find this argument persuasive.

¶ 56      As an initial matter, Anthony first claims that Cathy has forfeited any challenge to the use of the affidavit, because Cathy's counsel affirmatively stated that he "[did not] have an objection" when told that Anthony's counsel had been "walking [Ryan] through the affidavit the whole time." Cathy, however, claims that the issue has been properly preserved because Cathy's counsel made a hearsay objection when Anthony's counsel sought to admit the affidavit into evidence, which was overruled, and it would have been futile to continue objecting. See *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 165 (2006) (an objection need not be repeated where the court has previously ruled). However, Cathy's argument conflates the objection to the *admission* of the affidavit into evidence with the *use* of the affidavit as part of the process used in examining Ryan. Even if Cathy's attorney objected to the admission of the affidavit, he was still required to separately object if he believed that Anthony's attorney was attempting to use the affidavit for an improper purpose. See *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 86 ("Defendant's objection to the admission of the other-acts evidence did not relieve him of the responsibility of *further* objecting when he believed that the State was making improper use of the evidence." (Emphasis in original.)). His failure to do so has forfeited the issue on appeal. See *York v. El-Ganzouri*, 353 Ill. App. 3d 1, 10 (2004) (" 'Where a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is waived.' " (quoting *In re April C.*, 326 Ill. App. 3d 225, 242 (2001))).

¶ 57      Indeed, not only did Cathy's counsel fail to object, but he affirmatively stated that he had *no* objection to the use of Ryan's affidavit in guiding Ryan's examination. He cannot now

24

contest the admissibility of evidence he agreed to allow. During Ryan's testimony, after Ryan was asked a question about the contents of the affidavit, Cathy's counsel interjected:

> "CATHY'S ATTORNEY: I'm sorry. Is he reading from the affidavit?
>
> ANTHONY'S ATTORNEY: I've been walking him through the affidavit the whole time.
>
> CATHY'S ATTORNEY: Forget it. *I don't have an objection.*" (Emphasis added.)

Thus, by affirmatively representing that he had no objection to Anthony's counsel's "walking [Ryan] through the affidavit," Cathy's counsel consented to the process. "[A] party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). Accordingly, we cannot find that Cathy has preserved any objection to the use of Ryan's affidavit.

¶ 58    Moreover, even if the issue had been properly preserved, we can find no error in the approach taken by Anthony's counsel. There is no dispute that Anthony's counsel used the affidavit to provide an outline for Ryan's testimony—he even stated at the hearing that "I've been walking him through the affidavit the whole time." However, we cannot agree with Cathy's position that using the affidavit as an outline means that Ryan was testifying from a "script." The record shows that Anthony's counsel would ask Ryan a question about a part of the affidavit, and then examine the bases for Ryan's answers and ask follow-up questions based on Ryan's testimony. For instance, the first time Ryan was asked about the contents of the affidavit was in connection with a statement in the affidavit that Cathy asked Ryan to lie about Castagna's cohabitation. Anthony's counsel followed up by asking Ryan several questions about the timing and contents of the conversation. Similarly, when asked about a statement in the affidavit claiming that Ryan witnessed Castagna living with Cathy during Ryan's 2014

Christmas break, Ryan was also asked multiple follow-up questions about the trip, who was present, and how often he observed Castagna at Cathy's home. Anthony's counsel used the same approach with respect to a series of text messages between Ryan and Cathy—identified the text message at issue, then asked follow-up questions about the circumstances behind the message. There is no indication that Ryan's testimony was not based on his independent recollection, and, thus, even if the issue was not forfeited, we would not find that the trial court abused its discretion by permitting Ryan to testify in this manner.

¶ 59                                  III. Finding of Cohabitation

¶ 60        Next, Cathy argues that the trial court erred in finding that she was cohabitating with Castagna. Under the Illinois Marriage and Dissolution of Marriage Act (Marriage Act), "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2016). To prove the existence of a resident, continuing, conjugal relationship, the party seeking to terminate maintenance "must show that the other is involved in a *de facto* husband and wife relationship with a third party." *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 188-89 (2004). "It is the burden of the party seeking termination of maintenance to demonstrate that the former spouse is involved in a continuing, conjugal relationship." *In re Marriage of Bates*, 212 Ill. 2d 489, 524 (2004). The purpose underlying the termination of maintenance upon cohabitation "is to remedy the inequity created when the recipient spouse becomes involved in a husband-wife relationship but does not formalize the relationship, so that he or she can continue to receive maintenance from his or her ex-spouse." *Sunday*, 354 Ill. App. 3d at 189 (citing *In re Marriage of Arvin*, 184 Ill. App. 3d 644, 649 (1989)). Each case rests on its own set of facts, and "to preserve the primacy of the trial court's position in finding those

unique facts, a court of review will not disturb the trial court's determination concerning the existence of a *de facto* husband-wife relationship unless that determination is contrary to the manifest weight of the evidence." *Sunday*, 354 Ill. App. 3d at 189. "A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence." *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 41.

¶ 61　　To determine whether the spouse seeking to terminate maintenance has satisfied his burden, we examine the totality of circumstances and consider six nonexhaustive factors: (1) the length of the relationship, (2) the amount of time spent together, (3) the nature of activities engaged in, (4) the interrelation of personal affairs, including finances, (5) whether they vacation together, and (6) whether they spend holidays together.[3] *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 26; see also *Miller*, 2015 IL App (2d) 140530, ¶ 40; *In re Marriage of Thornton*, 373 Ill. App. 3d 200, 209 (2007); *Sunday*, 354 Ill. App. 3d at 189; *In re Marriage of Snow*, 322 Ill. App. 3d 953, 956 (2001). Examining these factors, we cannot find that the trial court's finding of cohabitation was against the manifest weight of the evidence. As there is substantial overlap between the factors, we discuss them collectively instead of analyzing them separately.

¶ 62　　We first note that there is no dispute that Cathy and Castagna have a close relationship that has spanned a number of years. The only dispute is whether that relationship is that of friends

---

[3] While Anthony agrees that these six factors are the appropriate ones to consider, he appears to take issue with Cathy's suggestions that the factors must be "weighed," as set forth in *Miller*. It is unclear what purpose Anthony believes the factors should serve, if not to be weighed, especially given that several of the factors involve qualitative determinations and cannot be merely "checked off" a list. We also find curious Anthony's contention that neither *Miller* nor *Thornton* are "[p]recedential," as both cases remain good law—in fact, Anthony relied on *Thornton* in his closing argument, and the trial court quoted *Miller* in its order.

and business partners or of *de facto* spouses. Here, we cannot find that the trial court's conclusion of the latter was "unreasonable, arbitrary, or not based on the evidence." *Miller*, 2015 IL App (2d) 140530, ¶ 41. The evidence showed that Cathy and Castagna have been in some type of relationship since 2007, when they were involved in a romantic relationship. While Cathy testified that the romantic aspect of their relationship ended in 2011, the trial court did not find her testimony credible. By contrast, Ryan testified that, on his visits, he observed Cathy and Castagna sharing a bedroom, which he further testified contained only one bed. Text messages between Cathy and Ryan also often referenced Castagna's presence, such as comments about his driving her to the doctor or purchasing plane tickets. Castagna was also present during Ryan's visits over Christmas, including exchanging Christmas gifts on at least one occasion. Castagna also told Goodman, the private investigator, that " '[w]e've been living here since September' " when Goodman knocked on the door of Cathy's residence.

¶ 63    There is also no dispute that they spend a great deal of time together. While Ryan testified that Castagna was always present during his visits, even Cathy's and Castagna's testimony showed that they were often together (albeit for different reasons). They maintained apartments in the same apartment building for a time, with Castagna occupying an apartment so small that it did not even contain a shower. They also traveled together, sometimes staying in the same hotel room, and Castagna testified that both had business debit cards and paid for business expenses from the same account. While Cathy testified that all of their activities were based around their business, the trial court was not required to credit her testimony, and we will not overturn a factfinder's credibility determination. See *Miller*, 2015 IL App (2d) 140530, ¶ 41 ("As a general rule, we will not disturb a trial court's credibility determination." (citing *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002))). The trial court also pointed to the fact that

28

Castagna had no experience as a photographer when Cathy hired him (and had no experience as a caretaker when Cathy claimed he was caring for her), and that Castagna was not earning a salary from the business, despite the business' revenue increasing each year. Additionally, Ryan testified that he believed that Cathy was financially supporting Castagna "[b]ecause I believe she basically told me that. It was kind of a known thing between my sister and I, that that was the case."

¶ 64    We must also note that the trial court expressly noted that it based its findings, in part, on the conduct of Cathy and Castagna in relation to the court proceedings at issue. The court pointed to a subpoena for deposition that was sent to Castagna at Cathy's address, which Cathy signed for; Cathy contended that she had stopped signing when she discovered that it was not addressed to her, but the trial court expressly found that "[t]his was not true" and that Cathy had signed the green card, which is used for the acknowledgment of certified mail. Castagna then used the allegedly improper service to refuse to appear for a deposition. The court additionally noted that Castagna had filed multiple motions in the instant litigation as an "attempt[ ] to insert himself into the litigation." The court also noted that Cathy had attempted to intimidate Ryan to coerce him not to testify, and had previously asked him not to inform Anthony about Castagna's presence. Given all of the evidence presented at the hearing, as well as the trial court's credibility determinations, we cannot find that it was against the manifest weight of the evidence for the court to find that Cathy and Castagna were cohabitating on a resident, continuing, conjugal basis.

¶ 65                                IV. Witness Tampering

¶ 66    Next, Cathy argues that the trial court's finding that "Cathy is guilty of witness tampering" was void because Cathy had no notice that such an issue would be considered by the court. "A

29

party cannot be granted relief in the absence of corresponding pleadings; if a justiciable issue is not presented to the court through proper pleadings, the court cannot *sua sponte* adjudicate an issue." *Suriano v. Lafeber*, 386 Ill. App. 3d 490, 492 (2008) (citing *Ligon v. Williams*, 264 Ill. App. 3d 701, 707 (1994)). Any such order entered by the court is void, as the court has exceeded its jurisdiction. *Suriano*, 386 Ill. App. 3d at 492.

¶ 67 In the case at bar, however, there was a pleading before the court at the time of the hearing that concerned Cathy's alleged intimidation of Ryan. On February 7, 2018, Anthony had filed a motion seeking sanctions against Cathy for intimidating and harassing Ryan. On April 24, 2018, the trial court entered an order providing, in relevant part, that "[a] determination of whether sanctions will be issued in connection with each count of Anthony's [motion] is hereby reserved until final hearing on Anthony's Petition to Terminate or Modify Maintenance and for Other Relief." During the hearing on the petition to terminate maintenance, Anthony's counsel specifically referenced this motion in his closing argument as one that was before the court. We thus cannot find that the trial court improperly entered a finding that Cathy was "guilty of witness tampering."

¶ 68 We note that, in her petition for rehearing, Cathy expresses the belief that this finding results in a criminal conviction against her, which she contends violates her constitutional rights. However, although the court's choice of words could have been better, it is clear that the court was imposing a sanction, not finding Cathy guilty of a crime, and we cannot find that the imposition of such a sanction exceeded the court's jurisdiction.

¶ 69                                    V. Attorney Fees

¶ 70 Finally, Cathy contends that the trial court erred in granting Anthony attorney fees. Attorney fee awards under section 508 of the Marriage Act, as occurred in the case at bar, are

reviewed for an abuse of discretion. *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 67; *In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005). "A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court." *Schneider*, 214 Ill. 2d at 173.

¶ 71        In the case at bar, the trial court awarded fees pursuant to section 508(b) of the Marriage Act, which provides:

> "In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party. If non-compliance is with respect to a discovery order, the non-compliance is presumptively without compelling cause or justification, and the presumption may only be rebutted by clear and convincing evidence. If at any time a court finds that a hearing under this Act was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2016).

¶ 72        In the case at bar, the hearing on Anthony's petition to terminate maintenance was a "hearing under this Act," and the trial court specifically found that Cathy "did everything she could possibly come up with to delay the case and to *** obfuscate the truth of the matter," which constitute "[i]mproper purposes" under section 508(b). Accordingly, we cannot find that the trial court abused its discretion in awarding Anthony attorney fees.

¶ 73    We are unpersuaded by Cathy's argument that attorney fees are only permissible in a proceeding "for the enforcement of an order or judgment," as stated in the first sentence of section 508(b). We note that the language of the last sentence is broader, referring to "a hearing under this Act," so it is not clear that attorney fees are only appropriate in enforcement proceedings. However, we have no need to resolve this question because the prohibition against cohabitation is expressly incorporated into the parties' agreement concerning maintenance. Specifically, a January 13, 2015, agreed order modified the parties' marital settlement agreement to provide that Anthony's maintenance payments "shall forever terminate immediately upon" Cathy's cohabitation as found by a trial court. Accordingly, even if section 508(b) requires the proceeding to be one "for the enforcement of an order or judgment," the proceeding at issue in the case at bar would satisfy that standard.

¶ 74                                    CONCLUSION

¶ 75    For the reasons set forth above, we affirm the trial court's judgment. First, while Ryan's "affidavit" was admissible only for impeachment purposes, any substantive use of the document did not constitute reversible error where his testimony established the same facts. Second, Cathy has forfeited her arguments as to the use of the document as an outline to Ryan's testimony and, even if she had not, its use was not error, where Ryan testified pursuant to his independent recollection, and not according to a "script." Third, the trial court's finding that Cathy and Castagna were cohabitating on a resident, continuing, conjugal basis was not against the manifest weight of the evidence. Fourth, the trial court did not act outside the scope of its jurisdiction by finding Cathy "guilty of witness tampering." Fifth, the trial court did not err in

awarding Anthony attorney fees where the court found that Cathy had engaged in delay and obfuscation.

¶ 76        Affirmed.