2022 IL App (2d) 210499-U
No. 2-21-0499
Order filed August 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| JUDITH LAMBROS, CATHLEEN BOURDAGE, NICHOLAS M. UMANO, CYNTHIA KROGH, and JO UMANO, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 17-CH-4 |
| | ) | |
| MICHAEL A. UMANO, Individually and as Trustee of the Eunice Umano Declaration of Trust Dated March 10, 1992, | ) ) ) | Honorable |
| | ) | Bradley J. Waller, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Birkett and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court erred in excluding plaintiffs' testimony regarding their observations of their mother's physical and mental condition under the Dead Man's Act. The trial court erred in barring documentary evidence under the Dead Man's Act and entering a directed finding as to plaintiffs' undue influence claim. The trial court did not err in denying admission of a Rule 1006 summary and in entering a directed finding against plaintiffs' breach of fiduciary duty and conversion claims. Therefore, we affirm in part, reverse in part, and remand.

¶ 2    At issue in this appeal are the trial court's entry of a directed finding as to plaintiffs' breach

of fiduciary duty, undue influence, and conversion claims; and the propriety of the trial court's

evidentiary rulings, including the exclusion of evidence under the Dead Man's Act (735 ILCS 5/8-201 (West 2020)). For the reasons below, we find the trial court erred in entering a directed finding on plaintiffs' undue influence claim and the trial court erred in excluding certain evidence under the Dead Man's Act; but not on their fiduciary duty and conversion claims. Therefore, we reverse in part, affirm in part, and remand.

¶ 3                                I. BACKGROUND

¶ 4    Defendant, Michael A. Umano (Michael), and plaintiffs, Judith Lambros (Judy), Cathleen Bourdage (Cathy), Nicholas M. Umano (Nick Jr.), Cynthia Krogh (Cindy), and Jo Umano (Jo), are the adult children of Nick L. (Nick Sr.) and Eunice Umano (Eunice), whose estate is at issue. After Nick Sr.'s death in 2003, Eunice moved into Michael's home. Michael was named as Eunice's agent under two powers of attorney: a successor trustee to the Eunice Umano Declaration of Trust (trust), and executor to her will. He was also made a joint tenant with right of survivorship on her Fifth Third Bank checking account. The children were all equal contingent beneficiaries under the trust. Under the terms of Eunice's will, the children would divide her personal property equally among themselves, and the remainder of the estate would pour over into the trust. Eunice suffered a stroke on February 23, 2016. She passed away on August 8, 2016.

¶ 5    Plaintiffs filed the instant complaint on January 10, 2017, sounding in breach of fiduciary duty, undue influence, conversion, and a petition to compel an accounting. They alleged essentially that Michael was in possession and control of all trust and estate property but had failed to make appropriate distributions; that on March 25, 2016, after Eunice's stroke, Michael caused Eunice to execute a change to her IRA beneficiary designation to give himself a 57% share of the distribution; and that he charged Eunice excessive rents to live in his home, made her pay a portion of the property taxes on the home, and otherwise converted her funds to his benefit.

¶ 6    The matter proceeded to a two-day bench trial commencing on July 27, 2022. In their case in chief, plaintiffs Jo, Cathy, Judy, and Cynthia were called as witnesses.

¶ 7    Jo testified as follows. Around March 1, 2003, shortly after Nick Sr.'s death, the siblings met at Eunice's home to discuss her future care. The meeting took place in the kitchen, but Eunice did not wish to take part in the conversation and went with Cindy's husband, Dr. Pete Krogh (Pete), to the living room. She was separated by a door and hallway and took no part in the conversation. After discussing the matter, the siblings came to an agreement. Jo and Michael would be added as cosigners to some of Eunice's accounts. Eunice's home would be sold and afterward she would move into Michael's basement. Michael's mother-in-law, Rita, was currently living with him and his family, and had paid around $80,000 to $90,000 to add an addition onto Michael's home, which she used as her apartment. Eunice would pay a similar amount to renovate the basement into an apartment for herself. The understanding was that Eunice would use the basement apartment as her "home base" and spend time at the other sibling's homes as she pleased. However, that did not come to pass, as Michael made it difficult for her to visit the others by refusing to make arrangements, reschedule doctor's appointments, or take Eunice to the airport. There was also an agreement that Eunice would not have any more out-of-pocket costs to live with Michael or the other siblings.

¶ 8    Eunice's house was sold in March 2004, with Jo handling the sale, and Eunice moving in with Michael. Shortly after Eunice moved in, Jo was removed from Eunice's accounts. On November 26, 2009, Jo called and emailed Michael to ask that she be added back onto Eunice's checking account. He said that he would do so, but never did.

¶ 9    In December 2010, Rita passed away. During a phone conversation with Michael around that time, Michael remarked that because of Rita's death, Eunice would have to pay a greater

portion of the utilities and property taxes to pick up the slack. This was the first time Jo learned that Eunice was paying for utilities or property taxes, as that was not part of the original agreement. From 2011 to 2015, Jo requested that Michael send her Eunice's tax returns, which he refused to do. In October 2012, Jo and Cindy called Eunice's financial advisor, Mr. Cannan to try and get information regarding Eunice's finances. Afterward Michael called them yelling and swearing irately about the matter. On March 10, 2016, Jo and Cindy visited Eunice at her apartment in Michael's home.

¶ 10    Cathy testified consistently with Jo's testimony regarding the March 2003 meeting at Eunice's home. She had been balancing Eunice's checkbook for around two years before Eunice moved in with Michael. Afterward it became difficult because she was not getting all of the information she needed. She asked Michael for it, but he told her not to worry about it as he was tracking it online.

¶ 11    Judy testified that around the fall of 2010, she had a conversation with Eunice's financial advisor, Cannan, regarding approximately $200,000, which was no longer in her mother's accounts. This was around the time Michael's family had gone on a cruise. She called Michael to inquire about how the cruise was paid for, because Michael had previously told her that he had paid for it, but she now believed Eunice had paid for the cruise. She also inquired regarding a $36,000 CD that was missing. Michael replied that it was none of her business how their mother spent her money.

¶ 12    Cindy testified consistently with Jo regarding the March 2003, meeting. She further testified as follows. Sometime in late 2009, she became concerned regarding money that was being taken from her mother's accounts, and she called Cannan to discuss the matter. Later she received a phone call from Michael telling her she was not allowed to talk to Cannan regarding Eunice's

finances. Around December 2010, after Rita died, Cindy met with Michael at his home, and she asked if he was paying his wife, Joan Umano (Joan), to take care of Eunice. He said that he was because Joan deserved it, and it was only $10 per hour. Cindy maintained that the siblings had not previously discussed paying Joan to take care of Eunice.

¶ 13    There was a meeting on August 14, 2016, after Eunice's funeral. Cindy, Jo, Pete , Michael, and Joan were present. There was a discussion regarding the IRA beneficiary designation, and Michael said, "Yes, I did that. I'm sorry. I'm going to make it right. I'll try to talk to Mr. Cannan but I think it's too late now that Mom died but I will make it right for all of you. I don't know why I did that." Michael then began crying and was very upset. On cross-examination Cindy testified that there was some discussion between Michael, Jo, and herself regarding the expenses Eunice was paying to Michael. Eventually they agreed that $400 per month was reasonable. It is not clear when this conversation took place.

¶ 14    The record reflects that the Dead Man's Act presented a near-constant issue during the plaintiffs' testimony, and their testimony was severely circumscribed as a result. Plaintiffs made the following offers of proof regarding their testimony which was ultimately precluded by the Dead Man's Act. Jo, Cathy, Judy, and Cindy would testify that sometime on June 26, 2011, there was a meeting with an elder law attorney in Aurora. Jo, Michael, Cathy, Judy, and Eunice were present. Cindy had called in via speaker phone. Cathy and Cindy wanted to have an attorney appointed to Eunice to review her finances. The attorney would agree to do so only if they could speak with Eunice privately. Michael objected and the meeting ended.

¶ 15    Jo and Cindy would testify that between March 10 and 18, 2016, after Eunice's stroke, they visited Eunice at Michael's home. Jo observed that Eunice could not talk or swallow. They attempted to play cards, but Eunice could not hold the cards. They tried to play several games, but

Eunice could not understand directions. She could not understand what was being said to her, was unable to open her hands, and could not have signed a document.

¶ 16    Plaintiffs also sought to admit several financial documents into evidence, consisting primarily of statements from the joint Fifth Third Bank checking account shared by Eunice and Michael, copies of checks from that same account, statements from Eunice's Fifth Third Bank credit card, and statements from Michael and Joan's joint Chase bank account. The trial court barred admission of these documents on the basis that they represented transactions undertaken or directed by Eunice, and thus were barred under the Dead Man's Act.

¶ 17    Michael was called as an adverse witness and testified as follows. Eunice had a stroke on February 23, 2016. He does not recall what kind of stroke or speaking with any of Eunice's doctors. He recalled depositing a check for $8980 from Eunice's IRA account in the joint Fifth Third Bank account after Eunice's death. He used that money to pay his attorneys. Likewise, Michael's testimony was limited by the application of the Dead Man's Act.

¶ 18    At the close of plaintiffs' case Michael moved for a directed finding on all counts. The trial court denied the motion for directed finding as to count I (entitled "Accounting"). With the exception of the $8980 of the trust's funds used to pay Michael's attorneys, the trial court granted the motion as to counts II and III (entitled "Undue Influence, Conversion and Breach of Fiduciary Duty"). In so ruling, the court found plaintiffs had not established the elements of conversion, nor had they established that Michael owed plaintiffs a fiduciary duty during Eunice's life. Therefore, the court did not need to address the breach and undue influence issues.

¶ 19    After the court ruled on the motion for directed finding, Michael testified on his own behalf that apart from the $8980, the money left in the Fifth Third Bank joint checking account was used to pay medical bills arising from Eunice's final illness and funeral luncheon.

¶ 20   The trial court then found in favor of plaintiffs as to count I and ordered an accounting. The court also found that the majority of the litigation related to Michael's activities prior to becoming trustee; namely, the cost of the litigation, did not properly fall upon the trust. As such the court ordered the remittance of the $8980, less the one sixth share Michael was entitled to under the trust.

¶ 21   Plaintiffs timely appealed.

¶ 22                                    II. ANALYSIS

¶ 23   Plaintiffs raise the following arguments on appeal: (1) Jo and Cindy should have been permitted to testify as to Eunice's physical and mental condition following her stroke, because her condition was a "status" rather than an "event" and therefore was not barred by the Dead Man's Act; (2) the trial court erred when it barred plaintiffs' documentary evidence, as the Dead Man's Act applies only to testimony, (3) Michael and Joan's bank account records were relevant to determining whether Michael misappropriated funds for his benefit and therefore should have been admitted; (4) the trial court erred when it did not admit plaintiffs' Illinois Rule of Evidence 1006 (eff. Jan. 1, 2011) summary of Eunice's income; and (5) notwithstanding the evidence which was erroneously excluded, plaintiffs submitted sufficient evidence to state a *prima facie* case for each of their claims and therefore the trial court erred in entering a directed finding in favor of Michael. Conversely, Michael maintains that even if the excluded evidence were admitted, plaintiffs would not have been able to establish a *prima facie* case to avoid the directed finding. We will first address whether the entry of directed finding was appropriate.

¶ 24                              A. Directed Finding

¶ 25   Section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2020)) provides that in all cases tried without a jury, a defendant may move for a finding or judgment in their favor

at the close of plaintiff's case. In ruling on such a motion, the trial court must first determine whether the plaintiff has presented a *prima facie* case by showing at least some evidence to support each element of their claim. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). If the plaintiff has failed to establish a *prima facie* case, the trial court should grant the motion. *Kokinis v. Kotrich*, 81 Ill. 2d 151, 155, (1980). If however, the plaintiff has provided at least some evidence as to each element of their claim, the trial court then moves to the second prong, and must consider all the evidence, including evidence favorable to the defendant. *Cryns*, 203 Ill. 2d at 275-76. The court must then consider whether, in light of all the evidence, any of the plaintiff's evidence has been negated and whether there is still evidence to establish a *prima facie* case. *Id.* Motions for directed findings granted under the first prong of the analysis are reviewed *de novo*, whereas motions granted under the second prong will not be reversed unless they are against the manifest weight of the evidence. *Id.* In the instant case, the trial court's findings were made at the first stage, and our review is *de novo*.

¶ 26                              1. Breach of Fiduciary Duty

¶ 27     "[I]n order to state a claim for breach of fiduciary duty, it must be alleged that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000).

¶ 28     The conduct at issue all occurred during Eunice's lifetime. The complaint alleged that Michael owed plaintiffs a fiduciary duty as trustee of the trust and executor of Eunice's will. The children were all contingent beneficiaries under the terms of the trust, taking equal shares of the trust property upon Eunice's death. While the children were only contingent beneficiaries to the trust during Eunice's life, "[a] trustee owes the same fiduciary duty to a contingent beneficiary as to one with a vested interest in so far as necessary for the protection of the contingent beneficiary's

rights in the trust property." *Burrows v. Palmer*, 5 Ill. 2d 434, 440 (1955). During Eunice's life she was the trustee and Michael was successor trustee. Michael would succeed to the role of trustee only in the event of Eunice's resignation as trustee, death, or inability to manage her affairs. The trust laid out the circumstances under which Eunice would be deemed unable to manage her affairs:

> "I shall be considered to be unable to manage my affairs if I am under a legal disability or by reason of illness or mental or physical disability am unable to give prompt and intelligent consideration to financial matters, and the determination as to my inability at any time shall be made by Nick L. Umano, my husband, and my physician, or the survivor of them, and the trustee may rely upon written notice of that determination."

Under the terms of the trust Michael was Nick Sr.'s survivor. No evidence was presented that Eunice resigned her position, or that steps were taken to have her declared legally disabled, or that Michael and her physician determined that she was unable to manage her affairs. As such, there is no evidence that Michael succeeded to the role of trustee prior to Eunice's death and, therefore, no evidence establishing a fiduciary duty to plaintiffs.

¶ 29 As executor, Michael would owe his siblings a fiduciary duty as the beneficiaries of Eunice's estate. *In re Karavidas*, 2013 IL 115767, ¶ 42. However, plaintiffs cite no authority for the proposition that an executor owes a duty to the beneficiaries of an estate during the testator's lifetime, nor are we aware of any. As plaintiffs have otherwise failed to establish that Michael owed them a fiduciary duty, the trial court properly directed out their breach of fiduciary duty claim. Further, none of the contested evidence serves to establish a fiduciary duty, and therefore even if it were admissible, it would not have affected the directed finding.

¶ 30                                    2. Undue Influence

¶ 31 While typically discussed in relation to the procurement of a will, a claim for undue

influence may be used to set aside a variety of conveyances such as leases (*La Salle National Bank v. 53rd-Ellis Currency Exchange, Inc.*, 249 Ill. App. 3d 415, 418-19 (1993)), deeds (*Sears v. Vaughan*, 230 Ill. 572, 592 (1907)), prenuptial agreements (*Kosakowski v. Bagdon*, 369 Ill. 252, 260 (1938)), stock purchase agreements (*Marvel of Illinois, Inc. v. Marvel Contaminant Control Industries, Inc.*, 318 Ill. App. 3d 856, 859 (2001)), a transfer-on-death designation to a bank account (*In re Estate of Elias*, 408 Ill. App. 3d 301, 321 (2011)), purported gifts of personal property (*id.*), and trusts (*Kelley v. First State Bank of Princeton*, 81 Ill. App. 3d 402, 414 (1980)).

> "What constitutes undue influence cannot be defined by fixed words and will depend upon the circumstances of each case. [Citation.] The exercise of undue influence may be inferred in cases where the power of another has been so exercised upon the mind of the testator as to have induced him to make a devise or confer a benefit contrary to his deliberate judgment and reason. [Citation.] Proof of undue influence may be wholly inferential and circumstantial. [Citation.]" *In re Estate of Hoover*, 155 Ill. 2d 402, 411-12 (1993).

One circumstance under which a presumption of undue influence will arise is where, "(1) a fiduciary relationship exists between the testator and a person who receives a substantial benefit from the will, (2) the testator is the dependent and the beneficiary the dominant party, (3) the testator reposes trust and confidence in the beneficiary, and (4) the will is prepared by or its preparation procured by such beneficiary." *DeHart v. DeHart*, 2013 IL 114137, ¶ 30. The presumption that a child has exercised undue influence over a parent may be rebutted only by clear and convincing evidence. *In re Estate of Henke*, 203 Ill. App. 3d 975, 981 (1990).

¶ 32    Michael was an agent to Eunice under two powers of attorney. One was executed on March 10, 1992, naming him as successor agent to Nick Sr. and one was executed on November 22, 2011.

As a matter of law, as her agent under a power of attorney, Michael owed Eunice a fiduciary duty. *Estate of Alford v. Shelton*, 2017 IL 121199, ¶ 22 ("An individual holding a power of attorney is a fiduciary as a matter of law."). "The mere existence of a fiduciary relationship prohibits the agent from seeking or obtaining any selfish benefit for himself, and if the agent does so, the transaction is presumed to be fraudulent." *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 12. "Under a power of attorney for property, 'any conveyance of the principal's property that either materially benefits the agent or is for the agent's own use is presumed to be fraudulent.' " *Estate of Alford*, 2017 IL 121199, ¶ 23 (quoting *Spring Valley*, 2012 IL App (3d) 110915, ¶ 12). "Once a fraudulent transaction has been alleged, the burden then shifts to the agent to prove by clear and convincing evidence that the transaction was fair and did not result from his undue influence over the principal." *Id.*

¶ 33    Plaintiffs argue that Michael exercised undue influence in three areas: he caused Eunice to change her IRA beneficiary designation to give himself 57% of the proceeds, he caused the creation of a right of survivorship in Eunice's Fifth Third Bank account for his benefit, and he generally used Eunice's money during her life to his own benefit such as by having her pay a portion of his property taxes.

¶ 34                              a. IRA Beneficiary Designation

¶ 35    Plaintiffs maintain that under the terms of Eunice's power of attorneys, Michael had the ability to conduct trust transactions and designate beneficiaries. Two IRA designations were entered into evidence: one from May 8, 2007, which designated Michael, Kathy, Jo, Cindy, and Judy as beneficiaries in equal share, and another from March 25, 2016 (after Eunice's stroke), which designated 57% of the proceeds to Michael. Plaintiffs maintain that because the second designation materially benefited Michael, that designation is presumed to be fraudulent.

¶ 36    Plaintiffs have established as a matter of law that Michael owed his mother a fiduciary duty. Eunice had lived in Michael's home since 2004, and after her stroke, Michael and Joan were responsible for her care, placing Michael in a dominant position. Eunice clearly reposed trust and confidence in Michael. She named him as her agent under her power of attorneys, named him as executor of her estate, and named him as successor trustee to the trust. Understandably, this was the sticking point regards the procurement and preparation of the IRA designation. "The presumption of undue influence arises not from the mere fact of a fiduciary relationship, but from participation in procuring execution of the will." *Anthony v. Anthony*, 20 Ill. 2d 584, 587 (1960).

¶ 37    There was some evidence that Michael assisted in procuring the new IRA designation. Cindy testified that after Eunice's funeral She, Jo, Pete, Michael, and Joan met at Michael's house. She testified that Michael was confronted regarding the beneficiary designations in the IRA and said, "Yes, I did that. I'm sorry. I'm going to make it right. I'll try to talk to Mr. Cannan but I think it's too late now that Mom died but I will make it right for all of you. I don't know why I did that." As to this issue, plaintiffs did establish a *prima facie* case for undue influence based on the evidence admitted at trial.

¶ 38              b. Creation of Joint Account with Right of Survivorship

¶ 39    Plaintiffs argue that there is likewise a presumption of fraud which attaches to the addition of Michael to Eunice's Fifth Third account as a joint tenant with a right of survivorship. Michael maintains that this position is both incorrect and forfeited as it was not raised in the trial court and no evidence was presented regarding the creation of the joint account or right of survivorship. We agree that the issue is forfeited as plaintiffs never made this argument at trial. However, as the presumptions attached to the account are relevant to our discussion of the transactions made involving the account, we will briefly consider the matter. *Klaine v. Southern Illinois Hospice*

*Services*, 2016 IL 118217, ¶ 41 (forfeiture is a limitation on the parties, not the reviewing court).

¶ 40    "At the creation of a statutory joint tenancy, a presumption of donative intent arises and a party claiming adversely to the instrument creating the joint account has the burden of proving by clear and convincing evidence that a gift was not intended." *In re Estate of Harms*, 236 Ill. App. 3d 630, 634 (1992). "A lack of knowledge as to the purpose for creation of a survivorship account is insufficient as a matter of law to overcome the presumption of donative intent." *Id.* at 635. However, a presumption of fraud attaches to gifts made to one who stands as a fiduciary to the gift giver. *Id.* at 639.

¶ 41    Against this background, there are countervailing presumptions: (1) that as fiduciary to his mother, any gift from Eunice to Michael is presumptively fraudulent, and (2) donative intent is presumed from the creation of a joint tenancy with right of survivorship, unless clear and convincing evidence of a lack of donative intent is shown. *Id.*[1] Under normal circumstances, the countervailing presumptions "first establish each of the parties' *prima facie* obligation[s] and second negate the necessity for conclusive rebuttal evidence, leaving the trial court free to make a determination based on the facts and credibility of witnesses." *Id.* at 640. However, in instances where the joint account is created after the fiduciary relationship began, the presumption of fraud is greater. *In re Estate of Rybolt*, 258 Ill. App. 3d 886, 890 (1994).

_____

[1]Additionally, while Michael never testified so himself, defense counsel argued that if required, Michael would testify that all transactions stemming from the joint account were used to pay for things for Eunice, or to reimburse Michael for things he had purchased for her. This would tend to indicate that the account was what is known as a "convenience account" rather than a true joint account. See *In re Estate of Harms*, 236 Ill. App. 3d at 634.

¶ 42    In this instance, we do not know when the joint account was created or under what circumstances, as no evidence was presented on that point. Accordingly, we cannot say whether Michael participated in the procurement of the account or the right of survivorship. Therefore, even if plaintiffs' arguments were not forfeited, plaintiffs failed to establish a *prima facie* case for undue influence as it related to the creation of the joint account. Furthermore, none of the barred evidence served to further illuminate this point.

¶ 43                    c. *Inter Vivos* Transactions

¶ 44    There was some evidence produced at trial that Eunice was paying certain household expenses for Michael. For one, Jo and Michael discussed that Eunice was paying a portion of Michael's utilities and property taxes. There was also limited testimony that Eunice had paid for a family cruise. Further there was testimony that Michael was paying Joan to provide care for Eunice after her stroke. These transactions were all to Michael's benefit at a time when he was acting as a fiduciary to Eunice and therefore were presumptively fraudulent. *Spring Valley*, 2012 IL App (3d) 110915, ¶ 12. Under these circumstances plaintiffs did in fact establish a *prima facie* case for undue influence as it relates to the *inter vivos* expenditures from Eunice's funds for his benefit.

¶ 45                            3. Conversion

¶ 46    As for plaintiffs' conversion claim, they maintain that because the second IRA designation and right of survivorship are presumptively fraudulent, this constitutes evidence that Michael wrongfully assumed ownership over those funds. Further, the fact that plaintiffs were the prior beneficiaries to those funds is evidence of their rights to immediate possession.

¶ 47    "To prove conversion, a plaintiff must establish: (1) that he or she has a right to the property; (2) that he or she has an absolute and unconditional right to the immediate possession of the property; (3) that he or she made a demand for possession; and (4) that the defendant

wrongfully and without authorization assumed control, dominion, or ownership over the property." *Kovac v. Barron*, 2014 IL App (2d) 121100, ¶ 97. "There must be a concurrence both of the right of property, general or special, and of the actual possession, or the right to immediate possession, and this concurrence must exist at the time of the conversion." *Union Stock Yard & Transit Co. v. Mallory, Son & Zimmerman Co.*, 157 Ill. 554, 561 (1895). At the time the beneficiary designation and right of survivorship were created, the plaintiffs had no immediate right to possess any of the funds at issue. Accordingly, there can be no conversion, and the trial court's entry of a directed finding was appropriate.

¶ 48                                  B. Admissibility of Evidence

¶ 49    Plaintiffs argue that the trial court erred when it refused to admit the following evidence under the Dead Man's Act: testimony from Jo and Cindy regarding Eunice's physical and mental condition following her stroke; and plaintiffs' exhibits 6, 6A, 6B, 6C, 6D, 6E, 7, 8, 15, 16A, 16B, and 19 (which consisted of bank account statements from Eunice and Michael's joint account, copies of checks from that account, bank statements from Michael and Joan's Chase account, and statements from Eunice's credit card account). Plaintiffs also argue that plaintiffs' exhibit 26, a summary made under Illinois Rule of Evidence 1006, should have been admitted into evidence.

¶ 50                                  1. Jo and Cindy's Testimony

¶ 51    Plaintiffs argue that the trial court erred in barring Jo and Cindy's testimony regarding Eunice's physical and mental condition following her stroke, as the testimony did not relate to an event within the meaning of the Dead Man's Act.

¶ 52    Michael argues that the proposed testimony amounted to allegations that when Jo and Cindy visited Eunice, she was unable to or did not perform certain physical acts. Michael maintains that these would amount to events under the Dead Man's Act.

¶ 53    The Dead Man's Act provides that,

> "In the trial of any action in which any party sues or defends as the representative
> of a deceased ***, no adverse party or person directly interested in the action shall be
> allowed to testify on his or her own behalf to any conversation with the deceased *** or to
> any event which took place in the presence of the deceased ***." 735 ILCS 5/8-201 (West
> 2020).

"The purposes of the Act are to protect decedents' estates from fraudulent claims and to equalize the position of the parties in regard to the giving of testimony." *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005). "The Dead-Man's Act is intended to remove the temptation of a survivor to testify to matters that cannot be rebutted because of the death of the only other party to the conversation or witness to the event, but it is not intended to disadvantage the living." *Balma v. Henry*, 404 Ill. App. 3d 233, 238 (2010). Hence, the Act bars testimony that a specific event took place (*e.g.*, a payment was made) as well as testimony that a specific act did not take place (*e.g.*, no payment was made). *Gunn*, 216 Ill. 2d at 612. A trial court's decision to exclude evidence under the Dead Man's Act is reviewed for an abuse of discretion. *Id.* at 609. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 54    In support of their argument plaintiffs cite *Hartman v. Townsend*, 169 Ill. App. 3d 111 (1988). *Hartman* involved an action by an estate to recover monies given to a motel owner by the decedent. *Id.* at 113. The motel owner's wife testified that prior to their marriage she had lived with the decedent. *Id.* at 114 On review, the court held that the fact the wife had lived with the decedent was not an event within the meaning of the Deadman's Act. *Id.* at 117. In making that holding the court expressed that moving in together could constitute an event but the continued

relations were "more of a 'status' than a 'happening' or an 'occurrence.' " *Id.* The court in *Hartman* relied on the definition of "event" as defined in Black's Law Dictionary 498 (5th ed. 1979): " 'The consequence of anything; the issue or outcome of an action as finally determined; that in which an action, operation, or series of operations, terminates. Noteworthy happening or occurrence. Something that happens. Distinguished from an act in that an act is the product of the will whereas an event is an occurrence which takes place independent of the will such as an earthquake or flood.' " *Id.* at 116.

¶ 55    Plaintiffs maintain that the testimony regarding Eunice's condition is a status as discussed in *Hartman*, whereas Defendant maintains that the testimony describes actions that Eunice either did or did not perform and were therefore events.

¶ 56    There is little case law on the issue of what constitutes an event for the purposes of the Dead Man's Act, but we find guidance in the decision of *In re Estate of Sewart*, 274 Ill. App. 3d 298 (1995). There the plaintiff was the wife of the decedent's long-time friend, and she and her husband would visit the decedent on a weekly basis. *Id.* at 309. She would clean his home while she was there. *Id.* The plaintiff brought an action against decedent's estate seeking a declaration that an oral contract had been reached between the decedent, her husband, and herself where in exchange for services rendered, they would receive a legacy from the decedent. *Id.* at 300. The decedent's estate had asserted that the Dead Man's Act precluded the plaintiff from testifying to conversations with the decedent. *Id.* at 305. On cross-examination, the defendants questioned her regarding the decedent's activities between 1981 and his death in 1985:

> "[S]pecifically, whether [the decedent] was able to walk, speak, write, talk on the telephone, do his own banking, and drive a car. The plaintiff was further questioned on cross-examination as to whether [the decedent] ate at restaurants; whether he cooked for

himself; whether he was able to dress himself; whether he played golf; whether he took care of his own financial affairs and paid his own bills; and whether he was under any mental handicap. Finally, the plaintiff was asked whether [the decedent] would call her husband when he needed something and also when he did not need things." *Id.*

The plaintiff argued that this questioning effectively waived the Dead Man's Act and that she should be permitted to testify to her conversations with the decedent pursuant to subsection (a) of the Dead Man's Act. *Id.* 304-05. Subsection (a) of the Dead Man's Act provided, "If any person testifies on behalf of the representative to any conversation with the deceased *** to any event which took place in the presence of the deceased ***, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event." 735 ILCS 5/8-201(a) (West 1994).

¶ 57    On review the court held that,

"contrary to the plaintiff's contentions, the questions posed to the plaintiff by the defendants on cross-examination did not elicit testimony regarding her conversations with [decedent] or events that took place in his presence. The questions highlighted by the plaintiff show that she was asked general questions about [decedent] based upon her observations of him. She was not asked about any specific conversations she had had with [decedent], and, more specifically, she was not asked about any conversations between [decedent] and herself regarding [decedent's] relationship with her husband or his testamentary intent." *Sewart*, 274 Ill. App. 3d at 306.

¶ 58    The key takeaway from the *Sewart* decision is that testimony regarding the witness's observations and impressions of the decedent is permissible so long as it does not touch on specific conversations or events. Jo and Cindy's observations stem from a single visit with Eunice, as

opposed to the years of weekly visits in *Sewart* or the four-to-five-year relationship in *Hartman*. We do not believe, however, that this should act as a total bar to their testimony. The trial court barred Jo and Cindy's testimony regarding the visit with Eunice as an event which occurred in Eunice's presence. While we agree that any testimony as to what was said at that visit, or any specific occurrences is barred by the Dead Man's Act; Jo and Cindy should be permitted to testify to their general impressions of Eunice's mental and physical condition based upon that visit. For these reasons we find that the trial court abused its discretion by barring Jo and Cindy's testimony in its entirety.

¶ 59    We recognize that because Jo and Cindy's observations are based on a single visit, the line between general observations and specific occurrences is a fine one. On remand they should be allowed to testify as to their general observations of Eunice after her stroke, but the questions and answers on remand, by necessity, must be limited so as to exclude discussion of specific acts or occurrences. For example, in their offer of proof plaintiffs represented that Jo and Cindy would testify that they tried to play card games with Eunice. Such testimony would constitute an event and therefore is inadmissible.

¶ 60                           2. Documentary Evidence

¶ 61    Plaintiffs argue that the trial court erred in excluding certain documentary evidence under the Dead Man's Act. These documents consisted generally of bank account statements from Eunice and Michael's joint account, copies of checks from that account, bank statements from Michael and Joan's Chase account, and statements from Eunice's credit card account. Plaintiffs argue that under the plain language of the Dead Man's Act the disqualification of evidence is limited to testimony. Michael maintains that the contested documents represent financial transactions, and that a check or draft is not merely a document, but a financial instrument prepared

by the drafter instructing the financial institution to pay that amount. Thus, they are statements by the deceased as well as events for purposes of the Dead Man's Act. Michael further argues that even if the documents themselves were not barred by the Dead Man's Act, plaintiffs could not establish proper foundation for the documents, as the foundational testimony would be barred by the Act. Likewise, he argues that any testimony regarding the underlying transactions would be barred by the Act, rendering the admission of the documents of little to no probative value.

¶ 62    The construction of a statute is a question of law and is reviewed *de novo. Sperl v. Henry*, 2018 IL 123132, ¶ 23. The primary goal of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill. 2d 315, 319 (2010). The best indication of the legislature's intent is the plain language of the statute itself. *Id.* In determining the plain meaning of statutory language, the court looks to the statute as a whole, the subject it addresses, and the apparent intent of the legislature. *People v. Perry*, 224 Ill. 2d 312, 323 (2007). Where the statutory language is clear and unambiguous, it must be applied without resorting to additional tools of statutory interpretation. *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 74. "We are not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express." *Petersen v. Wallach*, 198 Ill. 2d 439, 446 (2002).

¶ 63    The plain language of the Dead Man's Act specifically bars testimony. See 735 ILCS 5/8-201 (West 2020). The Act in no way precludes the admission of documentary evidence amounting to business records that are otherwise admissible under the rules of evidence. The fact that the documents represent transactions involving Eunice, does not automatically render them inadmissible under the Dead Man's Act.

¶ 64    Further, while we agree with Michael that the Dead Man's Act can bar foundational

testimony and thus preclude admission of documentary evidence (see *In re Estate of Miller*, 189 Ill. App. 3d 171, 177 (1989) (cassette tape containing phone messages from decedent was barred because a proper foundation as to when the messages were left could not be laid in light of that testimony being barred by the Dead Man's Act)), that issue was never reached by the trial court. Even taking the Dead Man's Act into account, there may have been avenues in which a foundation could conceivably have been laid for such documents, *e.g.*, through Illinois Rule of Evidence 902 (eff. Sept. 28, 2018), or Michael's testimony.

¶ 65    We also do not agree with Michael's assertion that no testimony could be elicited regarding the documents. First, several of the checks appear to have been written by Michael, and while some of those checks would presumably have been drafted at the direction of Eunice, such that testimony as to those instructions would be barred by the Dead Man's Act, some of the checks may not have been, and in any event the trial court needed to hear that before applying the Dead Man's Act.

¶ 66    Additionally, as discussed *supra*, as Eunice's agent under her power of attorney, Michael owed her a fiduciary duty as a matter of law and any transaction to his benefit would have been presumptively fraudulent. Consequently, any payments to Michael or Joan from Eunice would be presumptively fraudulent, without any further context. Likewise, any transactions which were obviously to Michael's benefit would also be presumptively fraudulent. For example, there are checks made out to the De Kalb County Collector, which in light of the testimony regarding conversations between Michael and his siblings, it is reasonable to infer that the checks were for the payment of property taxes on Michael's home. While the Dead Man's Act may ultimately render the purpose of many of these transactions unknowable, there are some which could potentially be used to prove plaintiffs' claims. Therefore, the trial court erred in ruling that the

exhibits were *per se* inadmissible under the Dead Man's Act as events which occurred in Eunice's presence. On remand the trial court should consider the admissibility of the exhibits anew in light of this court's ruling.

¶ 67                                     3. Plaintiffs' Exhibit 8

¶ 68    With regard to plaintiffs' exhibit 8, the statements from Michael and Joan's joint bank account, plaintiffs make the additional argument that, if we find that the trial court barred exhibit 8 as irrelevant, then the trial court was in error as the bank statements are relevant. We do not find that the trial court barred exhibit 8 as irrelevant. The following exchange was held at the trial court regarding the admissibility of exhibit 8.

> "THE COURT: Michael and Joan Joint Chase account.
>
> MR. LUNDGREN [(defense counsel)]: I just— I guess it depends on why it's being offered, but I would—I don't know why it's relevant. I mean, to the extent that it's going to be offered to show negotiation of checks from Eunice, that would be my objection.
>
> MR. CRONAUER [(plaintiffs' counsel)]: And these are all on CDs, Judge, so.
>
> THE COURT: Well, it's a joint account so it's as much hers as it is his.
>
> MR. CRONAUER: Yes.
>
> THE COURT: So I'm going to be consistent."

The trial court then denied the admission of plaintiffs' exhibit 8. While defense counsel brought up the issue of relevance, it is clear from the context that the trial court's ruling was based on the Dead Man's Act. The trial court had just denied admission of the plaintiffs' exhibits 6 through 7 on the basis that they represented transactions undertaken by Eunice and were barred by the Dead Man's Act. The court's comment that it was going to be consistent makes it clear that the basis for denying plaintiffs' exhibit 8 was that the bank statements might reflect transactions involving

Eunice. Therefore, we need not reach the issue of relevance.

¶ 69                                  4. Rule 1006 Summary

¶ 70    Finally, plaintiffs argue the trial court erred in refusing to admit plaintiffs' exhibit 26, a Rule 1006 summary regarding Eunice's income. Illinois Rule of Evidence 1006 allows for the creation of a chart, summary, or calculation where the contents of an original document are voluminous and cannot be conveniently examined in court. Ill. R. Evid. 1006 (eff. Jan. 1, 2011). Plaintiffs' exhibit 26 purports to be a summary of Eunice's annual income as derived from her IRA distributions and Social Security benefits.

¶ 71    The trial court denied the admission of plaintiffs' exhibit 26 on the basis that the IRA distributions were already in evidence and it did not see why Eunice's social security benefits were relevant to the issue of damages. It is also worth noting that Eunice's social security benefits were not in evidence and had not been provided to opposing counsel or the court. See *People v. Wiesneske*, 234 Ill. App. 3d 29, 41-42 (1992) ("The language of [Federal Rule Evidence 1006], though, does not require that the original voluminous material be introduced into evidence; rather it merely requires that the summarized material be made available to the opposing party.").

¶ 72    We see no basis for overturning the decision of the trial court. This was a bench trial, and the trial court was in the best position to know what documents would be helpful in reaching its decision. Whether to admit evidence is within the discretion of the trial court. *Schultz v. Northeast. Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 296 (2002). If the trial judge believed this summary would not be helpful during his deliberations, we will not force it upon the court.

¶ 73                                  III. CONCLUSION

¶ 74    For the reasons stated, we affirm the De Kalb County circuit court's entry of a directed finding on plaintiffs' breach of fiduciary duty and conversion claims, and the ruling denying

admission of plaintiffs' exhibit 26, and reverse the entry of a directed finding on plaintiffs' undue influence claim, the ruling barring Jo and Cindy's testimony as to Eunice's mental and physical condition after her stroke, the ruling barring admission of plaintiffs' exhibits 6, 6A, 6B, 6C, 6D, 6E, 7, 8, 15, 16A, 16B, and 19, and remand for further proceeding consistent with this order.

¶ 75    Affirmed in part, reversed in part, and remanded.